[No. 5776.]

## DUNCAN v. EAGLE ROCK GOLD MINING AND REDUCTION COMPANY.

1. **Mining Location—Grantee of Alien Locator**—In an action brought to support an adverse claim, to an application in the United States Land Office, for patent to a mining claim, the plaintiff must affirmatively prove that the original locator was at the date of the location a citizen of the United States, or, if alien born, had declared his intention to become such citizen. Thomas v. Chisholm, 13 Colo. 105, followed; McKinley Creek Co. v. Alaska Co., 183 U. S. 563, and Manuel v. Wulff, 152 U. S. 505, distinguished.—(573-575)

2. ———**Application for Patent — Adverse Suit — Evidence**— In a suit to sustain an adverse claim the plaintiff must prove a location conforming to the statute, and including the territory described in his adverse claim as filed in the Land Office.—(577)

3. ———**Evidence—Plat**—A plat of what is alleged to be the plaintiff's location, but which was made upon assumption merely, without any reference to the location certificate, or the workings or monuments upon the ground, but in disregard of them, should not be received.—(579)

4. **Lode Claim—Location Certificate—Certainty in Calls**— Notwithstanding the provisions of sec. 3154 Mills' Stat. (Rev. Stat. sec. 4199), the location certificate must correctly describe the open cut, shafts, or adit, to which it refers.—(583)

5. **Mining Claim—Annual Labor—Evidence** — One claiming an unpatented mining claim, must, where the annual labor required by statute was not performed upon such claim, show that work done elsewhere was, at the time thereof, intended as the annual labor upon the particular claim, and was of the character and amount satisfying the statute.—(585)

Where the plaintiff asserts that work done in a tunnel, at a distance from his claim, was intended to develop such claim, and as the annual labor thereon, the defendant is entitled to a full and fair cross-examination upon the question of plaintiff's intention, and to show, if he can, that the work done in the tunnel was really intended for the development of a group, including many other lodes than that in controversy, and was not sufficient in amount to meet the requirements of the statute.—(585, 586)

6. **Mining Claims—Adverse Suit—Pleading—Forfeiture**— In a suit to support an adverse claim, the defendant, under a

general denial or its equivalent, may show non-performance by the plaintiff of the annual labor required by statute, upon his claim, and the consequent forfeiture.—(587)

*Appeal from Boulder District Court* — Hon. James E. Garrigues, Judge.

Mr. Charles B. Ward and Mr. Guy D. Duncan for appellant.

Mr. John R. Wolff, Mr. John R. Smith and Mr. Horace A. Hawkins for appellee.

Mr. Justice White delivered the opinion of the court:

John T. Duncan made application through the proper United States land office for patent to certain lode mining claims designated as Survey Lot No. 17,-375, situate in Sugar Loaf Mining District, Boulder County. The Eagle Rock Gold Mining and Reduction Company filed an adverse, and thereafter, within the time limited by law this suit, in support thereof, claiming of Duncan's lodes substantially all of the Black Prince, Black Prince No. 1 and Black Prince No. 2, located in 1904, as portions of its Ellmettie and Grace Lodes, located in 1898; Oro and Anna G., located in 1899; Everett, Washington and Monarch, located in 1900, and demanding damages, reasonable attorney's fees, and expenditures in support of the adverse. By the complaint the legal right to occupy and possess said premises, and to the possession thereof was claimed, "by virtue of full compliance with the local laws and rules of miners of said mining district, the laws of the United States and of the State of Colorado, by preemption and purchase, and by actual possession as lode mining claims located on the public domain of the United States."

Duncan, defendant below, denied specifically the allegations of the complaint, and alleged title in himself to the territory in question. The replication traversed the allegations of the answer. Upon the issues so joined, trial was had, resulting in a verdict for plaintiff, the appellee here, for possession of the territory in dispute, $225.00 expenses and counsel fees, in support of the adverse, and $700.00 damages. Motion for new trial interposed and overruled, judgment in accordance with verdict entered, and writ of restitution ordered. From the judgment, Duncan prosecutes this appeal, and assigns numerous errors, only a few of which we deem it necessary to consider.

Appellee, to prove its corporate existence and its citizenship, introduced in evidence a certified copy of its articles of incorporation showing that it was duly organized and existing, as a corporation, under and by virtue of the laws of the state of Colorado. No other proof of the citizenship of its stockholders was made, and it is contended that citizenship in that respect was not established. It appears from *Jackson v. The White Cloud Gold Mining and Milling Co.*, 36 Colo. 122, that the proof, upon the matter in question, was sufficient.

Appellee acquired some of its claims by purchase, and the others by location. Of the former were the Ellmettie and the Grace. The Ellmettie location certificate was filed by F. J. Rogers and William Capp, and an amended certificate thereof by William and M. L. Capp. The Grace location certificate was filed by William Capp. There was no evidence that Rogers, or either of the Capps, at the time of making the respective locations, or the conveyance of the claims to appellee, were citizens, or had declared their intention of becoming citizens, of the United States. Appellant contends that the.

appellee could not sustain its adverse as to these two claims, because it failed to prove the citizenship of the original locators, and in support of his contention cites several authorities.

In *Lee v. Justice Mining Co.*, 2 Col. App. 112, after announcing the statutory rule that none but citizens of the United States, and those who have declared their intention to become such, can acquire any right to public mineral lands, it is held that an alien cannot acquire such an interest in a mining claim upon the public domain, by location, as can be sold, and upon which a subsequent title can be predicated. That case was carried to this court, however, and in 21 Colo. 260 was overruled, it there being held that the court of appeals was in error in assuming that the record in the case presented a question as to the right of an alien to acquire by location a transferable interest in a mining claim, as that question could not, under the facts there presented, be raised.

In *Thomas v. Chisholm*, 13 Colo. 105, the title to a mining claim, based upon a prior location made by one Joseph Hudson and the Kansas City Mining and Smelting Company, a corporation, and by them assigned or conveyed to Chisholm, the defendant, was under consideration in an adverse suit, and it was expressly held necessary to allege and prove the citizenship of the original locator or locators, as well as the citizenship of the successful party to the action.

Appellee contends, notwithstanding these decisions, that the citizenship of the original locator is material only where he continues to be the claimant to the time of the institution, and determination, of an adverse suit. It must be conceded that many authorities so hold. Such is the doctrine announced in Morrison's Mining Rights (12th ed.), p. 286; Lind-

ley on Mines, § 233, and other authorities. We are constrained, however, to adhere to the doctrine, heretofore announced by this court, until there is a specific holding to the contrary by the United States Supreme Court. Appellee insists that such pronouncement has already been made by that tribunal, and that the doctrine of *Thomas v. Chisholm, supra,* has been overturned in *McKinley Creek M. Co. v. Alaska M. Co.,* 183 U. S. 563, 571, and *Manuel v. Wulff,* 152 U. S. 505.

We are of the opinion that neither of the cases go to the extent claimed by appellee. *Manuel v. Wulff* holds that a deed of a mining claim, by a qualified locator, to an alien, operates as a transfer of the claim to the grantee, subject to question in regard to his citizenship by the government only, and if such alien becomes a citizen, or declares his intention to become such at any time before judgment in a contest concerning such mining claim, the alien's disability to take title is thereby removed. In that case, on page 511, it is said: "We are of opinion on this record that, as Alfred Manuel (the original locator) was a citizen, if his location were valid, his claim passed to his grantee, not by operation of law, but by virtue of his conveyance, and that the incapacity of the latter to take and hold by reason of alienage was, under the circumstances, open to question by the government only. Inasmuch as this proceeding was based upon the adverse claim of Wulff to the application of Moses Manuel for a patent, the objection of alienage was properly made, but this was as in right and on behalf of the government, and naturalization removed the infirmity before judgment was rendered. * * * And as Moses Manuel was the grantee of a qualified locator, and became naturalized before the order, we conclude that there was error in the direction of a nonsuit."

*McKinley Creek Mining Co. v. Alaska Mining Co., supra,* does not appear to be an adverse, but rather a controversy in which the Federal government was neither directly nor indirectly interested. After reciting that, in *Manuel v. Wulff, supra,* the court had sustained the validity of a conveyance of a mining location to an alien, reversing a decision of the Supreme Court of Montana to the contrary, states that the "decision was based upon the difference between a title by purchase and title by descent, and the doctrine expressed that an alien can take title by purchase and can only be divested of it by office found"; and then quotes from the case of *Governeur v. Robertson,* 11 Wheat. 332, as follows:

"That an alien can take by deed, and can hold until office found, must now be regarded as a positive rule of law, so well established that the reason of the rule is little more than a subject for the antiquary. It no doubt owes its present authority, if not its origin, to a regard to the peace of society and a desire to protect the individual from arbitrary aggression. Hence it is usually said that it has regard to the solemnity of the livery of seisin, which ought not to be divested without some corresponding solemnity. But there is one reason assigned by a very judicious compiler, which, from its good sense and applicability to the nature of our government, makes it proper to introduce it here. I copy it from Bacon, not having had leisure to examine the authority which he cites for it: 'Every person' says he, 'is supposed a natural born subject that is a resident in the kingdom and that owes a local allegiance to the king, till the contrary be found by office.' This reason, it will be perceived, applies with double force to the resident who has acquired of the sovereign himself, whether by purchase or by favor, a grant of freehold."

It is then said: "The meaning of *Manuel v. Wulff* is, that the location by an alien and all the rights following from such location, are voidable, not void, and are free from attack by any one except the government."

It appears by these decisions that the court went no further than to hold that, whoever is occupying the public domain under an apparent valid claim, has a right to so continue until ousted by the government itself. That is, the citizenship of the holder and the original locator of the mining claim is subject to question only by the sovereign. In support of the proposition that a location made by an alien can be conveyed to a citizen, and when vested in the latter is as complete as if originally acquired by him by location, and that the government itself cannot assail his title, Mr. Lindley, in his work on Mines, § 233, argues that, if the government can, by direct conveyance to an alien, vest in him a title to the absolute fee, it follows that an alien can acquire a limited estate by location, subject to an inquiry as to his qualifications, when he seeks acquirement of the ultimate fee.

Unquestionably the sovereign is a competent grantor in all cases in which an individual may grant, but in the case of mining claims it will not, and does not, knowingly grant to an alien. Inasmuch, however, as every person is supposed a natural born subject that is resident in the kingdom, the sovereign in effect says to all, a certificate of location of a mining lode, complete in itself, gives an apparent right which must be recognized until the sovereign inquires into its validity. When the inquiry is made, the apparent right becomes, what it really is, no right at all.

The mineral lands of the United States are open to exploration and purchase only by citizens of the

United States, or by those who have declared their intention to become such. As citizenship goes to the very inception and initiative of the title or right to hold, as against the government, a non-citizen can never make a valid location, though one so made is apparently valid.

Proceedings to obtain title to mining property are in the nature of "inquest of office." "In such cases the sovereign is a party in fact to the proceeding, which is a direct one, for the procurement of title, and the objection of alienage, no matter by whom suggested, is based solely upon the right of the government to interpose the fact of alienage as a bar to procuring or holding an interest in realty. If, however, the grant of title, or the equivalent, is made to an alien, it cannot be attacked by any third party."—*Billings et al. v. Aspen M. & S. Co. et al.,* 52 Fed. 250.

The Ellmettie certificate of location called for 384 feet on said lode running southwest from the center of the discovery *shaft,* and 1,116 feet running northeast therefrom, and particularly described the lode as: Beginning at the northeast cornerstone of the Fair Count lode. The Fair Count lode was a patented claim. An additional or amended location certificate of the Ellmettie, filed in June, 1899, called for 360 feet running north 76 degrees 35 minutes west from center of discovery *shaft,* and 1,140 feet running south 76 degrees 35 minutes east from center of discovery *shaft,* and fixed the southwest corner thereof as Corner No. 1, which was also therein stated to be Corner No. 3, Survey No. 6980A, Fair Count lode; thence north 5 degrees 15 minutes east 151.54 feet to Corner No. 2, whence Corner No. 3 of said survey No. 6980 bears south 5 degrees 15 minutes west 1.5 feet. Corner No. 3 of the Ellmettie was identical with Corner No. 2 of the Grace

lode, and Corner No. 4 was identical with Corner No. 1 of the Grace lode. The claim, as described and fixed by its monuments and ties, was practically a rectangle lying due east of the Fair Count. The location certificate of the Grace lode called for 100 feet running north 78 degrees .05 minutes west from center of discovery *shaft,* and 1,400 feet running south 78 degrees .05 minutes east from center of discovery *shaft,* and the west end corner stakes thereof were made identical with the east end corner stakes of the Ellmettie lode. The Grace was also a right-angle parallelogram.

It is apparent from these descriptions, and the testimony likewise shows, that the Ellmettie was intended as an extension of the Fair Count, and the Grace was intended as an extension of the Ellmettie. The location certificate of the Grace, and the amended location certificate of the Ellmettie, and likewise the other location certificates of plaintiff's lodes, were all prepared by a deputy United States surveyor upon surveys made by him for that purpose. The descriptions in the certificates of the Grace and the Ellmettie lodes, and likewise the amendment of the latter, placed both those claims far south of any of the territory in controversy.

It was incumbent upon the plaintiff to clearly establish the segregation from the public domain, and the appropriation by it, of the particular territory claimed in its adverse. In order to do this, it was essential, among other requirements, that it produce in evidence certificates of location, or amendments thereof, in conformity with law, covering or including the particular territory in dispute. In this essential requirement it failed, and the court erred in not so advising the jury at the rec est of the defendant.

(37)

Whether the plaintiff is in any better position as to its other claims, the record does not disclose. Instead of locating and surveying its claims, in preparation for this suit, by the monuments given in the location, or amended location certificates, and the calls therein specified, the plaintiff wholly disregarded them, but produced upon a map, or plat, the alleged location and relative position of the several claims without any real or substantial facts for a basis.

After application for patent, the plaintiff took a deputy United States surveyor, and pointed out to him its alleged discovery workings, and location stakes of its several claims constituting the adverse. The surveyor thereupon assumed that these fixed the location of such claims, and reproduced them upon a plat in their relative position to each other, and to defendant's claims, as so pointed out. Some excerpts from the testimony of the surveyor will illustrate the worthlessness of this plat:

"Q.—If, Mr. Armstrong, you took the east corners of the Fair Count, as the west corners of the Ellmettie lode, and projected the side lines of the Ellmettie lode in accordance with the location certificate, then the Ellmettie lode would not touch any ground for which defendant has made his application for patent, would it? A.—What relation does the corner you refer to bear to this shaft? The Court: Can you answer that question? A.—No, sir. No one can answer it. Q.—Why did you not go to the Fair Count lode, Survey No. 6980A, for your place of beginning? A.—When I made this adverse survey? Q.—Yes, sir. A.—I never heard of it being done. I didn't go because it is not the custom. No one does it. We tie to the discovery shaft. Q.—You paid no attention to this certificate

(location certificate), did you? A.—I never do. * * . * I paid no attention to certificates.''

And, further: ''Q.—How far is that discovery adit from the end line, from the west end line, of the Grace lode? A.—One hundred and four feet. Q.—One hundred and four feet? Is that the correct distance between that adit and the actual end line of that claim? A.—As I found them on the ground. Q.—Now, I don't know just what you mean by your answer. Do you mean to say that that is the actual measurement as you took it upon the ground? A.— If you will let me explain, when I go upon the ground I pay no attention to the location certificates at all. I simply take the man out and say: 'Show me your stakes.' I run a traverse around to make a closed traverse. * * * Q.—When you started out to locate the claim, why did you take a discovery adit when the location certificate calls for a discovery shaft? A.—Because the man who owns the claim went with me and showed me the point he had taken as the point of discovery.''

The territory comprising the claims in dispute had been prospected for many years prior to the locations of plaintiff. Claims identical in name with some of plaintiff's had been located and abandoned. The country was covered with old, abandoned shafts, adits and discovery cuts. Under these circumstances it is clearly apparent that this map or plat upon which plaintiff's case was predicated, has nothing to support it, and should not have been received in evidence over defendant's objection. There is not the slightest evidence, in the entire record, to identify the claims described in plaintiff's several certificates of location, and amendments thereof, with its claims as designated upon the plat. In making the plat, plaintiff disregarded the rule that, in surveys, the deputy mineral surveyor is controlled by the record

of the certificate of location, and the markings on the ground, the latter controlling where there is a variation between the descriptive calls of the record and the monuments.—1 Lindley on Mines, § 396.

As said in *Thallman et al. v. Thomas,* 102 Fed. 935, 936: "The rule that monuments shall control courses and distances is recognized only in cases where the monuments are clearly ascertained. If there be doubt as to the monuments, as well as to the course and distance, there can be no reason for saying that monuments shall prevail, rather than the course given in the patent; and that is this case."

In the Ellmettie location certificate the west end corner stakes are practically the east end corner stakes of the Fair Count, yet the surveyor failed to take that into consideration, and failed to locate or show the Fair Count claim. The certificate of the Ellmettie calls for a discovery shaft, yet the surveyor took an adit and constructed the claim around it, notwithstanding a discovery shaft was upon the ground at the identical spot designated in the certificate of location. The location certificate of the Grace also calls for a discovery shaft, but again an adit was taken for the initiative point of the survey. The discovery shaft, adit, or cut, as the case might be, as called for in the certificate, constituted one of the principal monuments for the purpose of finding the claim. When the location certificate of a claim in the vicinity of territory which a prospector desires to locate calls for a particular monument, to wit: a shaft, an adit, a cut, or "a post four inches square, set two feet in the ground," the prospector has a right to look for, and to demand, the particular monument specified, and his rights cannot be jeopardized by proof of some other monument not designated.

In *Resurrection Co. v. Fortune Co.*, 129 Fed. 668, 672, it is said: "Parol evidence, however, is incompetent to substitute a different monument for one clearly called by a deed or patent, or by the survey upon which it is founded, because that course of proceeding would violate the settled rule that written contracts may not be contradicted or modified by oral evidence."

In that case, the patent did not call for a monument at Corner No. 3. The field notes were introduced in evidence, and, at said corner, called for a post 4 inches square, 4 feet long, 2 feet in ground, marked 3—2309, cut into the post. Evidence was then introduced that a round stake, 4 inches in diameter, with 2 blazes, the later on the side of the earlier, with the figures 3—2309 written in pencil, but not cut into the post, was really intended. The trial court instructed the jury that this stake satisfied the description of the corner post. In reversing that holding, it is said: "Its effect is to strike out of the patent and field notes the description of the square post marked by the figures '3—2309' cut into it, and to write into them the description of the round, blazed stake, inscribed with the figures '3—2309' by means of lead pencil, and in this way to violate the settled rule that written conveyances may not be modified or contradicted by parol."

This court, in *Pollard v. Shively*, 5 Colo. 309, 315, 318, said:

"In this case the call is for a post at the southwest corner, and it is insisted that parol evidence is admissible to show that, while a post is called for, a stump was in fact established as a corner.

"Courts have gone far in the admission of parol evidence in the matter of uncertain and disputed boundaries, but I am unable to see how this demand of the defendant can be sustained on principle. The

certificate, like a deed, must be construed *ex-visceribus suis.* When the intent is clearly expressed, no evidence of extraneous facts or circumstances can be received to alter it.—3 Wash. R. P. 400, 404; *Bagley v. Mornill,* 46 Vt. 99.

"The general rule stated more fully is, that parol evidence cannot be admitted to control or contradict the language of a deed, but latent ambiguities can be explained by such evidence. Facts existing at the time of the conveyance, and prior thereto, may be proved by parol evidence, with a view of establishing a particular line as being the one contemplated by the parties when, by *the terms of the deed,* such line is left uncertain.—3 Wash. R. P. 401; *Drew v. Swift,* 46 N. Y. 209; *Claremont v. Carlton,* 2 N. H. 369; *Peaslee v. Gee,* 19 N. H. 277.

"There is neither latent ambiguity nor uncertainty in the terms of the certificate, to bring it within the meaning of the rule.

"The call of the certificate is for a post. A stump does not answer the call. If parol evidence is admissible to show that a stump, and not a post, is the actual corner, it would be equally competent to show a pile of stones, or any other monument uncalled for. This would not be construing the calls of a survey, but making them; it would not be an application of the rule that monuments control courses and distances, but an infringement of the rule that in the absence of latent ambiguity a deed cannot be varied or contradicted by parol evidence. It would not be controlling courses and distances by monuments, but controlling both by parol evidence. —*Claremont v. Carlton,* 2 N. H. 369.

"The rule is, that where monuments are relied upon to control courses and distances, they must be found as called for. — *Buckner v. Lawrence,* 1 Doug. Mich. 19; *McCoy v. Galloway,* 3 Ohio 383;

*Seaman v. Hogeboon,* 21 Barb. 399; *Finley v. Williams,* 9 Cranch. 315.

"In the case of *McCoy v. Galloway, supra,* it was held that, where the patent called for a tree of one kind, it was not competent to show a tree of another kind. * * * Where there is a variation to any considerable extent between the courses and distances of the location certificate and monuments established on the ground, the record, with its misdescription, in point of fact, gives no notice of the ground actually appropriated. If the monuments are swept away, no search, no exercise of prudence, diligence or intelligence, would advise the subsequent locator of the prior appropriation. In such case the rule demanded by the defendant would work the greatest injustice and hardship, and would be an interpretation of the law in the interest of erroneous records and indolent claimants."

Appellee argues that, as § 3154, Mills' Annotated Statutes, makes an open cut, cross-cut, tunnel or adit, each the equivalent of a shaft, that, therefore, though the certificate of location calls for a shaft, and the proof shows an open cut, or an adit, there is no variance between the proof and the certificate. This contention is unquestionably sound, when applied to the discovery work required; but when used in a certificate, for the purpose of ascertaining the situs of the claim, it has not that force and effect. The legislature, in making a cut, a tunnel, or an adit equivalent to a discovery shaft, did not change the definition or meaning of those respective words. Notwithstanding the statute, an open cut or an adit is not a shaft, and in locating the claim that for which the certificate calls must alone be used. Moreover, the evidence is undisputed that, as located, the Grace was a straight claim with six posts, one at each corner, and one at the center of each side line;

yet upon the plat the claim is shown as extending from Corner No. 2, being also Corner No. 3 of the Ellmettie, north 67 degrees 36 minutes east 115.70 feet; thence south 82 degrees 41 minutes east 1369.97 feet to Corner No. 3. The surveyor having testified that he constructed this plat, not from the monuments and calls given in the certificates, but from the stakes upon the ground as pointed out, admitted that there were no stakes at either of the angle corners as shown on the plat; yet, in order to make the adit pointed out the discovery point, it was necessary to construct the claim with this angle. A plat or diagram so constructed, based upon assumptions only, in utter disregard of, and contrary to, the facts, should have no place in a court of justice.

Plaintiff conceded that the annual labor required by statute was not performed upon, nor within, its adversing claims, but contended that it had performed such labor through the Eagle Rock No. 1, Post Boy, and Georgie Marie tunnels on adjacent claims, comprising, with the claims in controversy, a group.

Plaintiff produced evidence as to the amount and value of work done in its tunnels in each year from 1901 to and including 1904, the year in which defendant's claims were located. Upon cross-examination, defendant attempted to show that, during those years plaintiff claimed a great number of lodes by possessory title, in addition to the claims forming the basis of the adverse, and that the work done in the tunnels, during each of those years, was intended by the plaintiff as the annual labor upon the entire group, and did not aggregate in value one hundred dollars for each claim; that plaintiff had notices posted upon each of the claims constituting the entire group to the effect that the work on such claims respectively was then being done through said tun-

nels. By instructions given, and by the rulings upon the admissibility of this evidence, the court denied defendant's right to make such inquiry, and held substantially that plaintiff need prove the annual labor only for the group of claims described in its complaint, instead of upon its entire group.

As the annual assessment work had not been done within the surface boundaries of the adverse claims, it was incumbent upon plaintiff to show that such work as had been done elsewhere was, in fact, intended at the time as the annual assessment work upon these particular claims, and was of such a character and sufficient in amount to satisfy the requirements of the law for the entire group.

In *Chambers v. Harrington,* 111 U. S. 350, 353, it is said: "The expenditure of money or labor must equal in value that which would be required on all the claims if they were separate or independent." And in *Mining Company v. Callison,* 5 Sawyer 439, the rule stated is: "A general system of work for the exploration of the whole ground embraced in these three sets of contiguous claims, seems to have been carried on by plaintiff. And we think that all work done was a part of that general system, and, as such, applicable to all the claims which had by purchase been concentrated in a single party, the plaintiff. * * * The natural and reasonable presumption is, that all the work is done as part of the system, and as such applicable to all the claims."

The question of the intention of the plaintiff as to the annual work done by it was, therefore, a material issue in the case. To make work done on a tunnel an improvement upon another mining claim under the law requiring annual labor, the work must have been done for the express purpose of benefiting such claim, and for its development.—*Bryan v. McCaig,* 10 Colo. 309. If plaintiff did an insufficient

amount of work to hold its entire group, yet posted notices that the work on each claim was being done through specific tunnels, it could not thereafter, when certain of such territory became valuable through discovery and development by others, apply the work to such particular territory only, in order to hold it. Defendant was entitled to a fair and full cross-examination of plaintiff's witnesses in order to bring before the jury the intent of the plaintiff at the time of doing the work.—*Resurrection Co. v. Fortune Co., supra.*

Where several contiguous mining claims constitute a group, and expenditures are made upon an improvement which is intended to aid in the development of all so held, the improvement constitutes a distinct entity, not subject to physical subdivision, or apportionment, in its application to the claims intended to be benefited by it. The work performed attaches to the claims collectively, and not severally. This is the rule clearly and forcibly announced by the Secretary of the Interior, *In re James Carretto* and other lodes, 35 L. D. 361, 364. It is there said: "To undertake to set apart or apportion a physical segment or section, or an arbitrary fractional part of a common improvement, and to credit the value thereof to a particular claim, is in violation of the theory of a common benefit, accruing from a common improvement. The scheme here invoked for adjusting the monetary worth of the benefit derived from a common improvement is, on its face, unreasonable, and leads to a result but little short of absurd. The department is of opinion that it is unwarranted and unauthorized by, and contrary to, the law. * * * In this or in any similar patent proceeding, where a part of the group is applied for and reliance is had upon a common improvement, the land department should be fully advised as to the total number

of claims embraced in the group, as to their owner-ship and as to their relative situations, properly de-lineated upon an authenticated plat or diagram."

Appellee, however, contends that, under the pleadings in this case, the question of whether the plaintiff had forfeited its lode claims for failure to do the annual assessment work, was not an issue; that forfeiture is an affirmative defense which must be specially pleaded, and if not, is waived.

Under a general denial, or its equivalent, each party to an adverse suit claims the title upon which the right of possession is based, and the court deter-mines which of the two holds it. Each are actors, and both may fail. As said in *Bryan v. McCaig, supra:* "The act of Congress of March 3, 1881, au-thorizing the jury to find that title to the ground in controversy has not been established by either party, makes it absolutely necessary that a party claiming the right to the possession of any portion of the pub-lic domain, in an adverse suit, by virtue of a mining location, must establish such right by evidence of a compliance with the state and federal statutes re-lating to the location and holding of mining claims. —*Becker v. Pugh,* 9 Colo. 589. The pleadings re-quired proof to be made of a compliance with the requirements of the statute; the policy of the law, without regard to the pleadings, requires such proof to be made."

Being an adverse suit, it devolved upon each of the parties to bring forward proof of every material fact necessary to sustain the validity of their respec-tive claims, and it was necessary for the appellee to prove the annual work, at least, for the year imme-diately preceding the location, or attempted location, of appellant's claims. This was evidently the view which the court and counsel entertained of the law at the trial. The plaintiff treated this as one of the

issues to be tried, and submitted evidence upon that theory. The defendant sought by cross-examination to show that the work done was insufficient by reason of the great number of claims in plaintiff's group, and it was error to deny him that right.

We will not prolong this opinion by discussion of other errors assigned, as it is clearly evident the judgment must be reversed, and it is so ordered.

*Reversed.*

CHIEF JUSTICE STEELE and Mr. JUSTICE BAILEY concur.

Decided April 4, A. D. 1910; rehearing denied November 14, A. D. 1910.