AD TWO, INC. d/b/a The Coffee Beanery; Airport Concessions, Inc.; Airport Services, Inc. d/b/a Quizno's and Peaberry Coffee; GRD & D, Inc. d/b/a Boyer's Gourmet Coffees; Laura Devarona d/b/a Varona Imports (Colorado Colors); Dick & Jane Pizza, Inc. d/b/a Domino's Pizza; First Class Baggage Co. f/k/a Golden Eel Import Co. of Colorado; Kellen Industries, Inc., d/b/a Rocky Mountain Chocolate Factory and the Studio; Mission Yogurt, Inc. d/b/a Penguin's Harvest Express; Trugoy, Inc. d/b/a TCBY Yogurt; Susan Vale, Inc.; and Lauren K. Wahlstrom, d/b/a The Colorado Collection, Petitioners,

v.

The CITY AND COUNTY OF DENVER, by and through The MANAGER OF AVIATION; and The Manager of Aviation, City and County of Denver, Respondents.

No. 99SC268.

Supreme Court of Colorado,
En Banc.

Sept. 11, 2000.

Hochstadt, Straw, Strauss & Silverman, P.C., Richard S. Strauss, Jordan Hochstadt, Denver, Colorado, Attorneys for Petitioners.

J. Wallace Wortham, City Attorney, City and County of Denver, Helen Eckardt Raabe, Assistant City Attorney, City and County of Denver, Denver, Colorado, Attorneys for Respondents.

Justice RICE delivered the Opinion of the Court.

We granted certiorari to review the judgment of the court of appeals in *Ad Two, Inc. v. City & County of Denver*, 983 P.2d 128 (Colo.App.1999). Petitioners, twelve concessionaires at Denver International Airport (DIA) (Concessionaires), challenged an order of the Manager of Aviation (Manager) for the City of Denver (City) interpreting a provision of the Concession Agreements between Concessionaires and the City as requiring Concessionaires to retain a certified public accountant (CPA) to perform an independent audit of their revenue statements. A hearing officer upheld the Manager's interpretation of the disputed provision and Concessionaires sought review of the hearing officer's decision pursuant to C.R.C.P. 106(a)(4). The district court and the court of appeals affirmed the hearing officer's decision in separate judgments. Upon review, we conclude that the hearing officer properly interpreted the disputed provision. Accordingly, we affirm the judgment of the court of appeals.

## I. FACTS AND PROCEEDINGS BELOW

In 1993 and 1994, Concessionaires entered into agreements with the City to operate concessions at DIA. Paragraph 5.07 of these agreements required Concessionaires to submit annual statements of the total of all revenues and business transacted during the preceding calendar year. This paragraph provided, in relevant part:

5.07 **BOOKS OF ACCOUNT AND AUDITING.** Upon the Commencement Date, Concessionaire shall keep within the limits of the City and County of Denver true and complete records and accounts of all Gross Revenues and business transacted, including daily bank deposits. Not later than February 28 of each and every year during the Term hereof, Concessionaire shall furnish to City a true and accurate statement of the total of all revenues and business transacted during the preceding calendar year (showing the authorized deductions or exclusions in computing the amount of such Gross Revenues and business transactions). *Such statement shall be prepared and certified to be true and correct by an independent certified public accountant.* Such statement shall be furnished for every calendar year in which business was transacted under this Agreement during the whole or any part of the year. (Emphasis added.)

In late 1995, as the first calendar year of operation at DIA was nearing an end, Concessionaires requested clarification from DIA representatives of the above-emphasized language in paragraph 5.07. After consultations with the City Attorney's Office, the Manager of Aviation issued an order on April 5, 1996, advising Concessionaires that the language in question required them to submit a report from an independent CPA after the CPA had audited the statement of revenues and business transacted. The Manager's order also indicated that financial statements signed by an officer of the company certifying the sales reported were unacceptable and that concessionaires who could demonstrate extraordinary economic hardship as a result of the independent audit should explain their circumstances to the City.

Concessionaires subsequently notified the City that they formally disputed the Manager's order. Concessionaires argued that the disputed language was ambiguous and impossible to perform as written because a CPA cannot ethically "certify" a revenue statement to be "true and correct," and, therefore, the language should be read as allowing an officer of a concessionaire to certify the revenue statements as true and correct. Pursuant to the written agreements with the City providing that all disputes arising from the agreements shall be resolved by an administrative hearing, the Manager appointed a hearing officer and a two-day hearing was held in November 1996. The hearing officer issued his findings of fact, conclusions of law, and ruling on January 10, 1997. The hearing officer affirmed the Manager's order and ruled that the disputed language was not ambiguous and that it was not impossible to perform because it could be satisfied by an audit opinion from an independent CPA that the revenue statement "presents fairly, in all material respects the revenues and business transacted."

Concessionaires sought district court review of the hearing officer's ruling pursuant to C.R.C.P. 106(a)(4).[1] The district court entered its order affirming the hearing officer's ruling on July 18, 1997. Concessionaires then sought further review by timely appeal to the court of appeals and the court of appeals affirmed the district court and hearing officer in *Ad Two, Inc.*, 983 P.2d at 132. We granted Concessionaires' petition for certiorari to review the judgment of the court of appeals.[2]

## II. ANALYSIS

Concessionaires contend that the disputed language of paragraph 5.07—"such statement shall be prepared and certified to be true and correct by an independent certified public accountant"—is ambiguous because it is susceptible to more than one reasonable interpretation. Furthermore, Concessionaires argue that rules of construction of an ambiguous contract compel the conclusion that their interpretation of the disputed language, which would allow an officer of a concessionaire to certify the annual revenue statements, should be adopted. We disagree with Concessionaires' argument for the reasons stated below.

### A. Standard of Review

■■■ Our review under C.R.C.P. 106(a)(4) is limited to "a determination of whether the [governmental] body or officer has exceeded its jurisdiction or abused its discretion, based on the evidence in the record before the defendant body or officer." C.R.C.P. 106(a)(4)(I). We review the record to determine if there is any competent evidence to support the hearing officer's decision. *See City of Colorado Springs v. Givan*, 897 P.2d 753, 756 (Colo.1995). The appropri-

ate consideration for an appellate court is whether there is sufficient evidentiary support for the decision reached by the administrative tribunal, not whether there is adequate evidentiary support for the lower court's decision. *See id.* Therefore, an appellate court is in the same position as the district court in reviewing an administrative decision under C.R.C.P. 106. *See id.*

■■■ However, contract interpretation is a question of law that is reviewed de novo and we need not defer to a lower tribunal's interpretation of the contract. *See Fibreglas Fabricators, Inc. v. Kylberg*, 799 P.2d 371, 374 (Colo.1990). Our review is guided by well-established principles of contract law. The primary goal of contract interpretation is to determine and give effect to the intent of the parties. *See USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997). The intent of the parties to a contract is to be determined primarily from the language of the instrument itself. *See id.* In ascertaining whether certain provisions of an agreement are ambiguous, the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed. *See id.* Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. *See id.* Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract. *See id.*

■■■ Terms used in a contract are ambiguous when they are susceptible to more than one reasonable interpretation. *See Browder v. U.S. Fidelity & Guaranty Co.*, 893 P.2d 132, 133 (Colo.1995). Absent such ambiguity, we will not look beyond the four corners of the agreement to determine the

---

**1.** This rule provides relief when "any governmental body or officer or any lower judicial body exercising judicial or quasi-judicial functions has exceeded its jurisdiction or abused its discretion, and there is no plain, speedy and adequate remedy otherwise provided by law." C.R.C.P. 106(a)(4).

**2.** We granted certiorari on the following issues:
   1. Whether the court of appeals erred when it affirmed the trial court's ruling and held that the contract language in section 5.07

of the agreements between the City & County of Denver (City) and its concessionaires at Denver International Airport were not ambiguous.
   2. Whether the court of appeals erred when it held that section 5.07 of the subject agreements required concessionaires to provide the City with revenue statements prepared in the course of an audit conducted by an independent certified public accountant.

meaning intended by the parties. *See Simpson*, 938 P.2d at 173. The mere fact that the parties may have different opinions regarding the interpretation of the contract does not itself create an ambiguity in the contract. *See id.*

## B. Application

■■■ Concessionaires contend that the disputed language of paragraph 5.07 is ambiguous and should be interpreted to allow an officer of a concessionaire to certify its annual revenue statement as true and correct, without input or review by a CPA. We conclude that the language is unambiguous and requires an independent review and verification of the revenue statement by a CPA.

The disputed language is contained within paragraph 5.07 of the agreement, titled "BOOKS OF ACCOUNT AND AUDITING." The language provides, "Such statement shall be prepared and certified to be true and correct by an independent certified public accountant." This language unambiguously demonstrates that the parties intended to require Concessionaires' revenue statements to be reviewed by a CPA so that the CPA could provide an independent statement as to the accuracy of the information. This independent verification of the revenue statements provides a level of assurance as to the overall accuracy of the statements.

While the exact language used in the provision contains terms that a CPA cannot employ, we conclude that the intent of the parties is fulfilled by requiring an independent CPA to perform an audit and provide a professional opinion that the revenue statements are free from material error. We recognize that the undisputed evidence indicates that a CPA cannot use the terms "certify" and "true and correct."[3] However, the evidence in the record is also undisputed that a CPA can provide an audit opinion that a financial statement "presents fairly, in all material respects, the revenues and business transacted."[4]

Our examination of the disputed language reveals that it clearly contains two components: (1) review and verification of the accuracy of the revenue statement, (2) to be performed by an independent CPA. By requiring an independent CPA to supply a professional opinion that the revenue statement is free from material error after an audit, both components of the provision are satisfied.

■■■ We have stated before that we should not allow a hyper-technical reading of the language in a contract to defeat the intentions of the parties.

> [The general rule] to be found in the authorities [is] that courts should give effect to the general purposes of a contract. Courts make due allowance for a common human failing, that of being careless in choosing words. We should not allow inept expressions to defeat the evident intentions of the parties.

*Hutchinson v. Elder*, 140 Colo. 379, 383, 344 P.2d 1090, 1092 (1959). We interpret the agreement's language "certified to be true and correct" as reflecting the parties' intentions to obtain independent assurance of the overall accuracy of the revenue statements. An independent CPA's professional opinion that a revenue statement is free from material error provides this independent level of assurance. The mere fact that a CPA cannot use the actual words "certify" or "true and correct" in a professional audit opinion should not defeat the intentions of the parties.

Interpreting the disputed language as Concessionaires propose would be inconsistent with the unambiguous language of the provision. Requiring an independent CPA to render an audit opinion provides a level of assurance as to the overall accuracy of the revenue statement which would not be present if an officer of a concessionaire simply certified the revenue statements himself or

---

3. The record contains undisputed evidence that standards promulgated by the American Institute of Certified Public Accountants contain no provisions permitting a CPA to use the words "certify" or "true and correct."

4. Moreover, the record reveals that Concessionaires' expert witness testified at the hearing that although auditors do not use the term "certification," a lay person's common use of that term refers to this type of audit opinion.

herself. Concessionaires' proposed interpretation would also render the second component of the disputed language meaningless because there would be no independent review of the financial statements.

As such, we conclude that the disputed language of paragraph 5.07 unambiguously requires an independent audit by a CPA indicating that the revenue statements are free from material error.[5]

## III. CONCLUSION

In sum, we conclude that the disputed language of paragraph 5.07 is not ambiguous and that the language demonstrates the parties' intention to provide for independent CPA review and verification of the overall accuracy of the revenue statements. Accordingly, we affirm the judgment of the court of appeals upholding the hearing officer's interpretation of the disputed language.

Justice HOBBS dissents.

Justice HOBBS, dissenting:

I respectfully dissent. The hearing officer, in my view, incorrectly determined that no ambiguity existed in regard to the disputed language of section 5.07 of the contract and ruled as inadmissible the concessionaires' evidence to the contrary. The language states: "Such statement shall be prepared and certified to be true and correct by an independent certified public accountant." The hearing officer's ruling is contrary to Colorado law that admits evidence demonstrating the ambiguity of a seemingly unambiguous contract provision.

The hearing officer refused to consider the evidence of the contested provision's ambiguity; the hearing officer's error in this regard led to his second error, his ruling that the disputed provision is unambiguous. These are errors that the majority does not correct. *See* maj. op. at 377–78. Because the record does not support the hearing officer's findings and conclusions, and because the hearing officer did not employ the appropriate legal standards, I would reverse the decision of the court of appeals with instructions. I

would require the agency to reopen the administrative proceeding, take additional evidence, and make a new determination applying the appropriate legal standards in order to ascertain the parties' intent regarding the disputed provision at the time of contract formation.

I.

### A. The Hearing Officer's Ruling in Light of the Evidence

The hearing officer refused to consider evidence demonstrating the contract provision's ambiguity, and ruled evidence going to the intent of the parties at the time of contract formation to be inadmissible. The record demonstrates that (1) a similar provision to the Denver International Airport (DIA) contracts was in use in the Stapleton contracts and had achieved a recognized construction that bore on the parties' intent at the time of DIA contract formation; and (2) Denver unilaterally changed this construction following execution of the DIA contracts. The undetermined issue in this case, which should be the subject of this court's remand order, is what the parties intended in regard to the phrase "such statement shall be prepared and certified to be true and correct by an independent certified public accountant."

This provision appears in a six-paragraph portion of the contract dealing with financial record-keeping by concessionaires. This contract portion is captioned "Books of Account and Auditing." It addresses the concessionaire's responsibility to keep within the City and County of Denver "true and complete records and accounts of all Gross Revenues and business transacted, including bank deposits." Not later than February 28 of each year the concessionaire is to furnish Denver with a true and accurate statement of the total of all revenues and business transacted during the preceding calendar year. The concessionaire agrees to establish and maintain a system of bookkeeping satisfactory to the City Auditor. Denver's Manager of Aviation has access during normal business

---

**5.** Because we conclude that the language is unambiguous, we do not consider evidence beyond the four corners of the document. *See Simpson*, 938 P.2d at 173.

hours to the concessionaire's books and records. The concessionaire is also required to keep and preserve for at least three years all sales slips, cash register tapes, sales books, bankbooks or duplicate deposit slips, and all other evidence of gross revenues and business transacted for such period. The City Auditor and the Manager of Aviation, or their authorized representatives, "shall have the right at any time to audit all of the books of account, bank statements, documents, records, returns, papers and files" of the concessionaire. Denver has the right to require the concessionaire to install point-of-sale cash register equipment. If, after an audit, Denver determines that the gross revenues and business transacted were understated more than three percent for the year, the concessionaire must then pay for the audit, as well as the amount of the deficiency, plus interest on the deficiency amount at eighteen percent per annum from the date due. Denver's right to perform an audit expires three years after the concessionaire's statement for that year is delivered to Denver. The concessionaire agrees that the City Auditor and the Manager of Revenue may inspect any sales tax return or report, and accompanying schedules and data, filed with Denver. The concessionaire waives any claim of confidentiality in connection therewith.

The language in question, "Such statement shall be prepared and certified as true and correct by an independent certified public accountant," refers to the annual "true and accurate statement of the total of all revenues and business transacted during the preceding calendar year." The word "audit" appears only in the provisions which allow the City Auditor and the Manager of Aviation to conduct an audit of the financial records the concessionaire is required to keep, and charge the costs of the audit to the concessionaire if the statement for the year is understated by more than three percent.

The parties do not dispute that the Stapleton contracts had similar language concerning certified public accountant (CPA) certification and that principles and standards of CPAs do not allow them to certify a client's statement as being true and correct. Accordingly, the City allowed company officers to certify that the annual statements were true and correct.

DIA's concessionaires executed contracts, with Denver, containing the Stapleton-type language in 1993, as they prepared for the opening of DIA. On April 5, 1996, the Manager of Aviation issued a memorandum to concessionaires entitled: "Clarification of Contract Language Annual Statement of Revenue and Business Transacted." This memorandum stated:

Questions have arisen regarding the interpretation of this language. The phrase "certified to be true and correct by an independent certified public account(ant)" means, or will be satisfied by, a report from an independent CPA *after the CPA has audited* the statement of revenues and business transacted.

(Emphasis added.)

Recognizing that no CPA would issue the certification specified in the Stapleton and DIA contracts, Denver thus chose to substitute, after the DIA contracts were executed, a yearly CPA audit requirement for its prior acceptance of company officer certification. Ms. Debra Lynn DeMuth, Denver's Manager of Finance at DIA, testified before the hearing officer that the language of the disputed provision did not mean what it says:

Q: And you are aware of the fact that it is not in compliance with generally accepted accounting principles and generally accepted auditing standards for an independent certified public accountant to certify a statement of gross revenues as being true and correct.

A: That language, per se, cannot be used.

She also testified that the concessionaires at Stapleton were not required to submit annual statements certified in any manner by CPAs and that certain businesses at DIA would not be required to have the new annual CPA audits required of other concessionaires.

Mr. D.C. Kiyemba, Audit Supervisor at DIA, also testified that annual audit statements from CPAs were not required for the Stapleton concessionaires despite similar contract language that required CPA certification:

Q: And from the independent concession-aires, or from all the concessionaires at Stapleton Airport, you never required annual statements from CPAs, did you?

A: I personally?

Q. Yes.

A. No.

Q. If you had received a statement of gross revenues for a concessionaire at Stapleton Airport that was merely signed off on by an officer of the company, that was acceptable to you, was it not?

A. Yes.

The record demonstrates that the expectation of DIA concessionaires at the time of contract formation did not include the later-imposed annual CPA audit requirement. Nevertheless, the hearing officer adopted Denver's reinterpretation of the contract language as being within the plain meaning of the contract. The evidence does not support this conclusion, as Denver was aware before the DIA contracts were executed that the CPA certification language could not mean what it said in light of principles and standards of the public accounting profession.

Accordingly, the evidence demonstrates that the disputed provision is ambiguous, not on its face, but because of a latent ambiguity. The hearing officer overlooked the doctrine of latent ambiguity, as does the majority.

## B. Latent Ambiguity

I conclude that a latent ambiguity exists in the disputed provision of section 5.07 of the contract. The hearing officer should have considered extrinsic evidence to determine the intent of the parties as to the disputed provision at the time of the contract's formation. As the majority states, the primary goal of contract interpretation is to determine and give effect to the intent of the parties. *See USI Properties East, Inc. v. Simpson,* 938 P.2d 168, 173 (Colo.1997). We must implement the clear terms of the agreement if the language of the contract is plain and unambiguous. *See id.* Thus, the threshold inquiry under this rule is whether the contract is ambiguous.

There are two different types of ambiguities. A patent ambiguity appears on the face of a document and arises from the language itself. *See In re Estate of Gross,* 646 P.2d 396, 397 (Colo.App.1981); *Black's Law Dictionary* 80 (7th ed.1999). A latent ambiguity exists where the language of the document, although clear on its face, is susceptible to more than one meaning. *See Environmental Defense Fund, Inc. v. Colorado Dep't of Health,* 731 P.2d 773, 776 (Colo.App.1986); *Gross,* 646 P.2d at 397. The doctrine of latent ambiguity comes into play only if someone who read the contract without knowledge of its real-world context of application would think it clear. *See Rossetto v. Pabst Brewing Co.,* 217 F.3d 539, 543 (7th Cir.2000).

In deciding whether a contract is ambiguous, "a steadily increasing number of courts have disavowed the plain meaning rule and have recognized the necessity of viewing extrinsic evidence." 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.7, at 34 (rev. ed.1998). In Colorado, we have adopted this more flexible approach. We may consider extrinsic evidence bearing on the meaning of the written terms such as evidence of local usage and of the circumstances surrounding the making of the contract. *See Lazy Dog Ranch v. Telluray Ranch Corp.,* 965 P.2d 1229, 1235 (Colo.1998) (holding that extrinsic evidence may be introduced to determine whether a deed is ambiguous); *Fire Ins. Exch. v. Rael,* 895 P.2d 1139, 1143 (Colo.App. 1995) (holding that extrinsic evidence may be introduced to determine whether the term in an insurance policy is ambiguous). However, we may not consider the parties' own extrinsic expressions of intent. *See Fire Ins. Exch.,* 895 P.2d at 1143. In addition, if we ultimately determine that the document is unambiguous, the conditionally admitted evidence must be stricken. *See Lazy Dog Ranch,* 965 P.2d at 1235.

On its face, the disputed provision appears to be unambiguous—the revenue statements are required to be prepared and certified as true and correct by an independent CPA. In interpreting the contract, however, it is clear that this provision is indeed ambiguous. The evidence presented clearly shows that CPAs

are not permitted to use the words "certify" or "true and correct." The provision is unenforceable as written and thus the plain language can not be the meaning intended by the parties.

In addition to the fact that the contract cannot be enforced as written, the circumstances surrounding the making of the contract provide ample support for the conclusion that an ambiguity exists. The hearing officer and the majority fail to consider this extrinsic evidence in determining that no ambiguity exists. The Stapleton contracts, which contained the same exact language as the contracts in dispute here, were interpreted very differently from the interpretation suggested by the plain language of the provision. Denver had not required the Stapleton concessionaires to provide Denver with revenue statements prepared by an independent CPA. Instead, Denver had historically accepted statements certified to be true and correct by the concessionaires' officers and owners, often without input or review by a CPA. Such circumstances clearly demonstrate that an ambiguity exists with regard to section 5.07's provisions.

Once an ambiguity is found, it should be resolved by giving effect to the intent of the parties. *See Fire Ins. Exch.*, 895 P.2d at 1143; *Duncan v. Eagle Rock Gold Mining & Reduction Co.*, 48 Colo. 569, 582, 111 P. 588, 593 (1910). Interpretation of the intent of the parties in an ambiguous contract becomes an issue of fact for the trial court to decide in the same manner as other disputed factual issues. *See Fire Ins. Exch.*, 895 P.2d at 1143; *Union Rural Elec. Ass'n v. Public Utils. Comm'n*, 661 P.2d 247, 251 n. 5 (Colo. 1983). After a contract is deemed ambiguous the trial court may use extrinsic evidence to assist it in ascertaining the intent of the parties. *See Cheyenne Mountain Sch. Dist. # 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993). Facts existing at the time the contract was formed, and prior thereto, may be proved by parol evidence. *See Duncan*, 48 Colo. at 582, 111 P. at 593.

Here, the hearing officer should have examined the extrinsic evidence available to determine what the parties intended by including the disputed provision in section 5.07 of their contract. In determining the parties' intent, the hearing officer should also have considered "two well established principles governing the interpretation of contracts." *Christmas v. Cooley*, 158 Colo. 297, 302, 406 P.2d 333, 336 (1965). First, in case of doubt, a contract is construed most strongly against the party that drafted it. *See id.* Second, where doubt exists as to the proper construction of a given clause, it should be construed in favor of the party for whose protection it was obviously inserted. *See id.*

Factual development of the case in regard to the parties' intent at the time of contracting should determine which of these seemingly contradictory principles of contract construction is applicable to this case. As a matter of law, the majority chooses an interpretation that favors Denver. It reaches this conclusion based on the assumption that the most important aspect of the disputed provision is the involvement of a CPA. *See* maj. op. at 376–78. On the other hand, another credible assumption based on Denver's past acceptance of officer certification of the annual revenue statement is that Denver considered the certification of truth and accuracy to be more important than CPA involvement. Because Denver can protect itself through the audit provision that is available for use by the Manager of Aviation and the City Auditor, the principle that the contract should be construed against the city as drafter may prevail.

We ought not to conclude that a provision is unambiguous when the actions of Denver, the drafter, demonstrate that it is ambiguous. Denver's 1996 memorandum requiring a CPA audit to be completed, instead of the officer certification previously acceptable, would not have been necessary if the disputed provision were unambiguous.

II.

Accordingly, I respectfully dissent and would remand this case to the hearing officer for further fact finding and determination on the issue of the parties' intent in regard to the disputed provision at the time of contracting.