Opinion by JUDGE RICHMAN
¶ 1 Plaintiff, Owners Insurance Company (Owners), appeals the trial court's judgment denying its petition to vacate an appraisal award. We affirm.
I. Background
¶ 2 Owners issued a property damage insurance policy to Dakota Station II Condominium Association, Inc. (Dakota). Wind and hail storms damaged buildings in the residential community owned by Dakota. The parties combined the losses into a single insurance claim but disagreed about the total amount of damages.
¶ 3 The parties then invoked the insurance policy's appraisal provision. Each party selected an appraiser. When the appraisers submitted proposed awards of differing amounts, they nominated a neutral umpire as provided in the insurance policy.
¶ 4 In calculating a final award of approximately $3 million, the umpire adopted four damage estimates from Owners' appraiser, Mark Burns, and two estimates from Dakota's appraiser, Laura Haber. Burns disagreed with the final award and declined to sign the final determination of costs. However, the umpire and Haber agreed and signed the award, and Owners paid Dakota.
¶ 5 Dakota later sued Owners in federal court, Dakota Station II Condo. Ass'n, Inc. v. Auto-Owners Ins. Co. , No. 14-CV-2839-RM-NYW, 2015 WL 6591888 (D. Colo. Oct. 30, 2015) (unpublished opinion), for breach of contract and unreasonable delay in paying insurance benefits. During discovery in the federal suit, Owners learned several facts about Haber that it alleges demonstrate she *787 was not an impartial appraiser as required by statute and by the insurance policy.
¶ 6 Owners then filed a petition to vacate the appraisal award under section 13-22-223, C.R.S. 2016, of the Colorado Uniform Arbitration Act (CUAA). Following a hearing, the trial court denied the petition in an oral ruling on March 11, 2016.[1]
II. Timeliness of Motion to Vacate
¶ 7 Dakota initially contends Owners failed to timely file a "motion" to vacate within ninety-one days of learning of its basis for vacating the award as required by section 13-22-223(2) because Owners' filing was captioned a "petition" rather than a "motion." We disagree. While the CUAA refers to a "motion" to vacate, rather than a "petition," the substance of the pleading, and not its title, governs. Hawkins v. State Comp. Ins. Auth. , 790 P.2d 893, 894 (Colo. App. 1990). We conclude that Owners' petition satisfied the statutory requirement for a timely motion to vacate the award.
III. Appraiser Impartiality Under the CUAA
¶ 8 Owners contends the trial court erred when it did not analyze the insurance policy's appraisal dispute provision, as well as the hiring and conduct of Haber, under the CUAA's standards for a neutral arbitrator in section 13-22-211(2), C.R.S. 2016. We find no error because the policy does not incorporate, and the parties' stipulation was not sufficiently specific to require application of, the CUAA's standards, in particular section 13-22-211(2).
¶ 9 The appraisal provision of the policy states:
If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser . The two appraisers will select an umpire. If they cannot agree, either may request that the selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.
(Emphasis added.)
¶ 10 At the hearing, the parties initially stipulated orally that the CUAA applies to their appraisal dispute. The trial court's order did not state whether it was applying any of the CUAA provisions. The UAA provides the parties with choices to be made regarding whether to have party arbitrators or impartial arbitrators. Because the parties' stipulation here did not specify whether the appraisers were to be treated as arbitrators, and if so, whether they were to be held to the statutory standard for impartial arbitrators, the UAA sections regarding disclosures to be made by impartial arbitrators did not apply. See sections 13-22-211 and 13-22-212, C.R.S. 2016.
¶ 11 Because of these ambiguities, Owners has not established that, even if Dakota's appraiser violated the CUAA, reversal would be required. Also, at least one other court has concluded an identical appraisal provision was not subject to the CUAA. Auto-Owners Ins. Co. v. Summit Park , 129 F.Supp.3d 1150, 1152-55 (D. Colo. 2015) (applying Colorado law).
IV. Appraiser Impartiality Under Insurance Policy
¶ 12 Whether Haber was an "impartial appraiser" under the insurance policy turns on the meaning of that term, which we must construe.
A. Standard of Review
¶ 13 We review the interpretation of contracts de novo.
*788 Fibreglas Fabricators, Inc. v. Kylberg , 799 P.2d 371, 374 (Colo. 1990).
¶ 14 The primary goal of contract interpretation is to give effect to the intent of the parties. Ad Two, Inc. v. City & Cty. of Denver , 9 P.3d 373, 376 (Colo. 2000). We determine the parties' intent by looking to the plain and generally accepted meaning of the contractual language. Copper Mountain, Inc. v. Indus. Sys., Inc. , 208 P.3d 692, 697 (Colo. 2009).
¶ 15 "The meaning and effect of a contract are to be determined from a review of the entire instrument, not merely from isolated clauses or phrases. A contract should be interpreted to harmonize and, if possible, to give effect to all its provisions." First Christian Assembly of God, Montbello v. City & Cty. of Denver , 122 P.3d 1089, 1092 (Colo. App. 2005) (alteration omitted) (citation omitted).
¶ 16 "The overriding rules of contract interpretation require a court to apply the plain meaning of the words used subject to interpretation from the context and circumstances of the transaction." Id. (citations omitted).
¶ 17 Written contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language. Ad Two , 9 P.3d at 376. A contract provision is ambiguous if it is reasonably susceptible of more than one meaning. Cheyenne Mountain Sch. Dist. No. 12 v. Thompson , 861 P.2d 711, 715 (Colo. 1993).
B. Impartiality Under This Policy
¶ 18 The only policy requirement clearly applicable to Haber's conduct is the policy provision providing that in the event the insured and the insurer disagree on the amount of the loss, either may demand an "appraisal" and each "will select a competent and impartial appraiser." The phrase "impartial appraiser" is not further defined in the policy. Thus it was the trial court's task to determine the meaning of the provision and whether Haber met the criteria of an impartial appraiser.
¶ 19 Although the phrase appears in many insurance policies, apparently no Colorado appellate court has construed it. See Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n , No. 14-CV-03417-LTB, 2016 WL 1321507, at *4-7 (D. Colo. Apr. 5, 2016) (unpublished mem. opinion and order).[2]
¶ 20 The trial court determined the appraisers provided for in this policy need not be impartial in the same manner as a judge, umpire, or arbitrator. Rather, they needed to be impartial in the sense that experts at a trial, such as a forensic chemist, need to be: rendering their opinions based on their experiences and not allowing themselves to be influenced by the litigants. We understand this to mean that an impartial appraiser in rendering his or her valuation opinion applies appraisal principles with fairness, good faith, and lack of bias. We conclude this is the correct reading of the policy provision and its intent.
¶ 21 We first note that because the policy does not define "impartial," any ambiguity in the term is construed against Owners, who *789 drafted the policy. Union Ins. Co. v. Houtz , 883 P.2d 1057, 1061 (Colo. 1994) ("Once an ambiguity in the policy language is found, it is construed against the drafter of the document and in favor of the insured.").
¶ 22 We then consider the context in which the term is used. Owners contends the word "impartial" has a common and usual meaning. Citing to Black's Law Dictionary, Owners asserts that "impartial" means "not favoring one side more than another; unbiased and disinterested; unswayed by personal interest." While we agree that an impartial appraiser should be unbiased and unswayed by personal financial interest, like an expert witness at trial, we do not agree that the impartial appraiser called for in this policy may not favor one side more than the other. We reach this conclusion from the context of the policy provision taken as a whole.
¶ 23 The relevant paragraph of the policy goes on to provide that the two appraisers will select an "umpire," and if the two appraisers fail to agree on the amount of loss, they will submit their differences to the umpire. Therefore, this language distinguishes the "impartial" appraisers from the umpire. Under this method, no one appraiser determines the final outcome; rather it is left to the umpire to resolve the differences between the appraisers.[3] The policy plainly contemplates that the appraisers will put forth a value on behalf of the party that selects them. The umpire, who is not selected by either party, makes the final determination.
¶ 24 Thus, the policy does not hold an appraiser to the standard of "not favoring one side more than another," in the sense that a judge or arbitrator (or the umpire under this policy) would be required to be impartial. Rather, we agree with the observation of the Iowa Supreme Court in this regard:
The appraisal procedure involves an adjudication of a dispute between parties; however, the selected participants must act fairly, without bias, and in good faith. The intent of the appraisal procedure is not to provide appraisers who possess the total impartiality that is required in a court of law. The appraisers do not violate their commitment by acting as advocates for their respective selecting parties. However, appraisers should be in a position to act fairly and be free from suspicion or unknown interest.
Cent. Life Ins. Co. v. Aetna Cas. & Sur. Co. , 466 N.W.2d 257, 261 (Iowa 1991). So long as the selected appraiser acts fairly, without bias, and in good faith, he or she meets the policy requirement of an impartial appraiser.
¶ 25 Owners challenges this interpretation, citing to Noffsinger v. Thompson , 98 Colo. 154, 156, 54 P.2d 683, 683 (1936) ("An arbitrator, in the discharge of his duties as such, is bound to exercise a high degree of impartiality, without the slightest degree of friendship or favor toward either party.") (citation omitted). But that case involved the impartiality of an arbitrator, without the policy context discussed above.
¶ 26 The dissenting opinion cites to Providence Washington Insurance Co. v. Gulinson , 73 Colo. 282, 283-85, 215 P. 154, 155 (1923), a case where the insurance policy provided for the selection of "two competent but disinterested" appraisers. The partial dissent cites the case for the proposition that "[a]ppraisers are not referees, but their duty of impartiality is the same" as that of a referee. Id. at 285, 215 P. at 155. However, the lack of impartiality in that case arose when one appraiser and the umpire entered the award without notice to the third appraiser, and, for that reason, the court did not approve the award.
V. The Trial Court's Determination as to Haber's Impartiality
¶ 27 The trial court considered the evidence and arguments put forward by Owners that Haber was not impartial. Applying its understanding of the policy requirement of an impartial appraiser, it made findings and reached conclusions on each contention of impartiality. On appeal, Owners contends the *790 trial court erred in making its findings or reached the wrong conclusion. We review each contention in turn, deferring to the trial court's findings of fact but considering de novo its conclusions of law. Loveland Essential Grp., LLC v. Grommon Farms, Inc. , 251 P.3d 1109, 1117 (Colo. App. 2010).
A. Haber's Meeting With Dakota's Board Prior to Appointment
¶ 28 Owners argues that Haber improperly met with the Dakota Board of Directors, and its public adjuster, prior to being chosen as the appraiser. There was no dispute that the meeting took place. But the trial court found it was proper, and that any rule prohibiting a pre-appointment meeting would discourage policyholders from pursuing the appraisal process provided for in the policy. The trial court emphasized that a pre-appointment meeting with an appraiser is prudent because Dakota could not be expected to authorize an expensive appraisal without some basis for believing it had a meritorious claim justifying the expense. Accordingly, the trial court rejected this claim.
¶ 29 We agree. Where an insured is contemplating retaining an appraiser, a pre-appointment meeting with the appraiser does not render the appraiser's final valuation impermissibly impartial.
¶ 30 Although not specifically referenced by the trial court, Haber's trial testimony revealed that at her pre-appointment visit she advised that there was "storm related damage" to the property, and a Dakota representative understood that the roofs needed replacement. But those observations, as the trial court found, were preliminary observations that supported retention of, and incurring the cost of, an appraiser. There was no evidence identified by Owners that Haber formed an opinion of the appraisal amount before retention, or before conducting her appraisal.
¶ 31 To the extent Owners argues that Haber was obligated to disclose this meeting under section 13-22-212, we disagree because, as noted above, the provisions of the CUAA do not apply.
B. Haber's Communication With Adjuster
¶ 32 Owners also argues Haber acted improperly by communicating ex parte with the public adjuster retained by Dakota during her appraisal.
¶ 33 The trial court noted this argument was based on provisions in an Insurance Commissioner's bulletin. But it found that the bulletin did not prohibit communications between Haber and Dakota while Haber performed her appraisal. The bulletin did prohibit such communications after Haber concluded her work and after the final umpire's decision. Therefore, the trial court concluded that Haber did nothing improper by contacting Dakota or its agent, referred to as the public adjuster.
¶ 34 Owners has not demonstrated any clearly erroneous findings by the trial court, and we agree that the trial court's factual conclusion is supported by the record.
C. Haber's Failure to Disclose Policy Coverage Period to Burns
¶ 35 Owners argues Haber had a "heightened duty to disclose" to Burns, Owners' appraiser, that the policy ending November 2012 did not cover damage from an August 2013 hailstorm. Owners claims Burns may have believed he was subject to the Insurance Commissioner's bulletin's restrictions on contacts between an appraiser and the insurance company, and thus would not have known the policy period. The trial court rejected this argument for three reasons.
¶ 36 First, the final appraisal award entered by the umpire indicated the dates of loss as May 24, 2012, and June 12, 2012. Both dates are within the policy period.
¶ 37 Second, Haber had no reason to believe Burns was under a misapprehension about the coverage period, and therefore had no duty to disclose the coverage period even if she had had such a duty in other circumstances.
¶ 38 Third, neither Haber, nor anyone representing Dakota, misled Burns into thinking that Owners was responsible for losses incurred in 2013.
*791 ¶ 39 Owners has not demonstrated any clearly erroneous findings by the trial court in this regard, and we agree that the trial court's factual conclusions are supported by the record.
D. Haber's Failure to Disclose Roofer Estimates That Predated June 2012
¶ 40 Owners argues Haber evinced partiality by failing to disclose the roofer estimates and recommendations gathered by Dakota before June 2012. Owners theorized these estimates might reveal the roofs' condition before the events during the policy period. The trial court rejected this argument, finding that Owners made no inquiry into these matters, and Dakota and Haber never misled Owners or failed to correct a misconception held by Owners. The trial court further found that the insurance policy did not create a duty for Dakota to inform Owners about the roof conditions, other than providing access for an investigation. Finally, the trial court concluded Dakota did not have a fiduciary duty to Owners that created a disclosure obligation. Thus, this contention did not demonstrate a lack of impartiality by Haber.
¶ 41 Again, because we cannot say that these factual findings were clearly erroneous, we concur with the conclusions of the trial court. To the extent Owners argues that the CUAA created a disclosure duty, we have already concluded the CUAA does not apply here. We also agree that the law does not place a fiduciary duty on an insured to make disclosures to an insurance company.
E. Haber Included A Claim for Damage to Siding Not Caused by the Hailstorm
¶ 42 Owners argues Haber's lack of impartiality was shown by her collaboration with the public adjuster to include damage to siding not caused by the covered hailstorms (but rather by a later storm) in the insurance claims. The trial court found that while some documentation indicated Dakota did not intend to include such damage, there was also documentation indicating a need to replace the siding due to damage that occurred before the later uncovered storm. And the trial court found the public adjuster noted damage to the siding and that Dakota would have to replace the siding and make roof repairs to conform to code. Therefore, the trial court found that there was no evidence showing a lack of damage to the siding during the covered period, and implicitly no improper conduct by Haber reflecting a lack of impartiality.
¶ 43 Again, because we cannot say that these factual findings were clearly erroneous, we concur with the trial court's conclusions.
F. Haber's Failure to Disclose the Policyholder's Tactical Decision
¶ 44 Owners argues Haber's lack of impartiality was evinced by her failure to disclose Dakota's "tactical decision" to pursue coverage under the Owners policy before deciding whether to bring a new claim against the subsequent carrier.
¶ 45 The trial court made no finding about whether Haber knew of this "tactical decision," nor do we find in Owners' briefs any record citation supporting a conclusion that Haber knew. Nonetheless, the trial court found that pursuing the claim against Owners was a "rational decision" by Dakota, and, in any event, once Dakota made the claim the tactic had "nothing to do with the appraisal process" set forth in the policy. The trial court also found that Haber had no duty to Owners other than to be impartial, and no duty to tell one side what the other side's tactical strategy "consisted of."
¶ 46 On appeal, Owners has not demonstrated, or even argued, that these factual findings are clearly erroneous. Nor has it cited to any law that holds an appraiser has a duty to disclose an insured's strategy to an insurer, even if the appraiser knows of the strategy.
G. Haber's Duty to Disclose That She and the Public Adjuster Were "Partners"
¶ 47 Owners claims Haber and Benglen, Dakota's retained public adjuster, were partners. The trial court concluded Haber was required to disclose such a relationship if it existed. But it found the evidence "clearly demonstrates" that the allegation was not *792 true. Although the public adjuster referred to Haber as "his partner," the trial court found "absolutely no evidence that they were partners or had any business relationship" akin to the ones described in section 13-22-212(1)(b).
¶ 48 On appeal, Owners contends this finding rests on an erroneous application of partnership law, or a misapprehension of the facts. We disagree.
¶ 49 Citing to section 7-64-308, C.R.S. 2016, Owners argues that "holding out" oneself as a partner creates a partnership. But the statute concerns liability to someone who relied on a representation of partnership. That is not the situation here. To the contrary, Owners asserts it did not know of the asserted relationship. Therefore the statute is inapplicable.
¶ 50 Owners argues the relationship between Haber and Benglen amounted to a relationship that should have been disclosed pursuant to section 13-22-212(1)(b). But the trial court considered that provision and found as a factual matter that no such relationship was supported by the evidence. Owners' assertion on appeal does not demonstrate why that factual finding was clearly erroneous.
H. Haber's Retention Contract Evinces Partiality
¶ 51 Dakota retained Haber under a written "appraisal contract."[4] The contract included the following conditions:
• An "initial minimum fee" of $750 for the first five hours of work, and an hourly fee of $150 if the time to settle the claim exceeds five hours.
• Invoices for the work were not to exceed "5% of the total replacement cost value."
• Fees were payable upon entry of the final appraisal award and are "not contingent upon payment of the Award by the carrier."
• The appraiser had a "responsibility to be impartial and also competent to handle the case."
¶ 52 Owners argues this contract evinced a lack of impartiality because it gave Haber a financial incentive to give a higher appraised value to increase her own fees.
¶ 53 The trial court rejected this argument for two reasons. First, it noted that no party suggested that the 5% cap came into play in setting Haber's fees. Five percent of the final appraisal award of $2.997 million is about $150,000. Although the record does not reflect the exact amount of Haber's final fee, the trial court stated it "would have been well under 2% [of the final award] pretty much no matter what the umpire decided."
¶ 54 Second, the trial court found that the contract terms did not show bias as a matter of law, nor did they show Haber had an interest in the litigation. The trial court found that the purpose of the 5% fee cap was to benefit Dakota; it provided protection for the "person paying the appraiser." And the provision required both parties' initials to invoke the provision. The court noted the 5% provision was not initialed by the parties, so "it is not an issue in the case."
¶ 55 We agree with the trial court that in the circumstances of this case, the 5% cap does not demonstrate a lack of impartiality on the part of the appraiser. Had the appraiser's fees exceeded 5% of the amount of the final appraisal, we might consider whether the appraisal was inflated to increase the recoverable fees. But in this case, we see no basis for concluding that Haber's impartiality was compromised by this 5% fee cap when 5% of the final appraisal was far in excess of the actual billed fees and the contract provision was not invoked.
¶ 56 We acknowledge that two Colorado federal cases reach a different conclusion as to whether appraisal fee contracts containing percentage fee caps render the appraiser not impartial. But the facts of those cases are different, or not fully discernable.
¶ 57 In Auto-Owners Insurance Co. v. Summit Park , 2016 WL 1321507, at *4-7, Judge Babcock concluded the insured's appraiser was not impartial. The appraiser's *793 contract, like Haber's, capped his fee at 5% of the replacement cost value of the final claims if an umpire was involved. But unlike in this case, Judge Babcock found a lack of impartiality for numerous reasons, and not just due to the percentage fee provision. Id. at *5-6.
¶ 58 We have already rejected the other arguments made by Owners, and we decline to reach the same conclusion as Judge Babcock.
¶ 59 Judge Babcock relied on Judge Brooke Jackson's decision in Colorado Hospitality Services Inc. v. Owners Insurance Co. , No. 14-CV-001859-RBJ, 2015 WL 4245821 (D. Colo. July 14, 2015) (unpublished order). There, an appraiser was deemed not impartial solely based on the contract which, like Haber's, had a fee cap of 5% of the replacement cost value of the final claims if an umpire was involved. Judge Jackson gave only a brief analysis, reading the contract to state that "the higher his appraisal amount, the higher the cap on his fee."
¶ 60 But in applying his rationale, Judge Jackson did not discuss or explain how the actual final appraisal in that case would have raised the actual fee paid to the appraiser. Rather, he looked at a different set of hypothetical replacement values, substantially different from the actual values arrived at by the umpire in the actual case, and, based on those values, stated that if the fee might be materially affected by the opinion, the appraiser could not be considered to be impartial. Id. at *2-3.
¶ 61 We disagree with the analysis in these two federal cases because Haber's fee in this case could not be, and was not, affected by the 5% cap. Had the umpire made the final award based entirely on Burns' appraisal, it would have exceeded $2.3 million. Thus, this was never a case like the hypothetical used by Judge Jackson where the final appraisal amount was only $50,000 leading to potential application of the 5% fee cap.
¶ 62 Nor was this a case like Shree Hari Hotels, LLC v. Society Insurance , No. 1:11-CV-01324-JMS, 2013 WL 4777212 (S.D. Ind. Sept. 5, 2013) (unpublished opinion), where the court found the insured's appraiser lacked impartiality based on a 10% fee cap because the cap would have come into play had the umpire adopted the insurance company's appraisal value ($90,000) versus the insured's appraisers value ($1,358,000). Id. at *2. Under those circumstances, the court found it was "not believable that [the insured's appraiser] did not have an incentive to make 10% of his appraisal figure meet or exceed the fee his hourly rate would have ... yielded." Id.
¶ 63 But those circumstances are not present here. Thus, we decline to conclude that the percentage fee cap in Haber's contract rendered her work not impartial.
I. Haber's Testimony About Being an "Advocate"
¶ 64 Owners argues Haber's testimony shows she was not impartial. In response to questioning from Owners' counsel as to whether "it's appropriate to be an advocate for an insured when you're acting as an appraiser," Haber replied, "I think it's natural. I think you're an advocate for Auto Owners." Owners argues on appeal that Haber's testimony demonstrates that she was not an impartial appraiser as required by the insurance policy.
¶ 65 The trial court did not explicitly reference this testimony in its final order. We therefore have no findings by the trial court as to the meaning of Haber's answer that she "thinks it's natural."
¶ 66 The question was not posed in connection with the policy's impartiality language. There was no clarification about what Haber understood was meant by "advocate," in this context, although she compared it to the lawyer's role as advocate for a client. And Haber's answer could be read as describing a general situation of a hired appraiser, not necessarily tied to the impartiality requirement of the insurance policy.
¶ 67 We conclude Haber's answer to this one question does not demonstrate that she lacked the impartiality required by the policy. As noted above, the policy did not require the independence required of a judge, arbitrator, or umpire. Both of the appraisers in this case had pre-existing relationships with *794 their retaining party. The respective parties provided, in part, the appraisal information relied on, thereby necessitating contact with those parties. Both appraisers knew an umpire would review their appraisals and select what the umpire found to be the more accurate appraisal. Under these circumstances, it is understandable that Haber may have viewed herself as an "advocate," but that does not mean that her appraisal was biased, dishonest, or purposely inaccurate. As stated by the Iowa Supreme Court, "appraisers do not violate their commitment by acting as advocates for their respective selecting parties. However, appraisers should be in a position to act fairly and be free from suspicion or unknown interest." Cent. Life Ins. Co. , 466 N.W.2d at 261.
¶ 68 We agree with this description of the appraisal process and the requirements placed upon the impartial appraiser. That one answer given by Haber does not show that she was acting with bias, in bad faith, or dishonesty in formulating her appraisal.
J. No Subjective Evidence of Bias or Lack of Impartiality
¶ 69 While Owners offers objective factors that could demonstrate a lack of impartiality, it points to no action, decision, or analytical choice made by Haber in rendering her appraisal report that shows a subjective lack of impartiality. It identifies no appraisal assumption made by Haber that should have been assumed differently but for the fact that it was the product of bias. And, while Haber's final appraisal was about $3,000,000, we cannot disregard the fact that even Owners appraiser presented a value in excess of $2,300,000. Thus, unlike the enormous gaps between the two appraisals in Shree Hari Hotels, LLC , or other similar cases, the appraisal by Haber is not palpably biased or lacking impartiality.
VI. Conclusion
¶ 70 For these reasons, we affirm the trial court's judgment denying Owners' motion to vacate the appraisal award.
Vogt* , J., concurs

In its notice of appeal, filed April 29, 2016, Owners stated the trial court did not enter a proposed written order. However, the appellate record contains a written order dated July 6, 2016, signed by a different judge than the judge who tried the case in March. The written order is substantially the same as the transcribed oral order. Because the appellate briefs refer primarily to the transcribed oral ruling, this opinion relies on the oral order entered on March 11, 2016.

In Summit Park , Judge Lewis Babcock directed the appraisal process to go forward and set the following guideline for an impartial appraiser: "[a]n individual who has a known, direct, and material interest in the outcome of the appraisal proceeding or a known, existing, and substantial relationship with a party may not serve as an appraiser." Auto-Owners Ins. Co. v. Summit Park Townhome Ass'n , No. 14-CV-03417-LTB, 2016 WL 1321507, at *1 (D. Colo. Apr. 5, 2016) (unpublished mem. Opinion and order). Owners, despite being a party to that case, does not argue that this "guideline" applies to Haber.
We also note that the Division of Insurance Bulletin B.5-26 specifies that a "fair and competent" appraiser is one who is "not a party to the insurance contract," has "no financial interest in the outcome of the appraisal," is "not a current employee of the insurer or policyholder," and is "not a family member or an individual with whom the insured has a personal relationship that could reasonably suggest bias." Colo. Dep't of Regulatory Agencies, Div. of Ins., Bulletin No. B-5.26, Requirements Related to Disputed Claims Subject to Appraisal, at 2 (re-issued Oct. 26, 2015), https://perma.cc/3JC4-37HG. Bulletin B.5-26 further instructs that an appraiser "may not have a direct material interest in the amounts determined by the appraisal process." Id. Owners does not argue for application of this provision's standards.

As noted by Judge Babcock in Summit Park , appraisers are not like arbitrators because they do not resolve pending disputes or determine ultimate liability. Auto-Owners Ins. Co. v. Summit Park , 129 F.Supp.3d 1150, 1154 (D. Colo. 2015).

This contract was prepared by Benglen, and signed by Dakota's representative and Benglen. Regardless, the parties agree that Haber operated pursuant to this contract.

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5 (3), and § 24-51-1105, C.R.S. 2016.