23CA2181 Fontanari v Snowcap 11-14-2014

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2181
Mesa County District Court No. 17CV30314
Honorable Douglas S. Walker, Judge
Honorable Jeremy Chaffin, Judge

---

Brett Fontanari, Trustee of the Rudolph and Ethel Carol Fontanari Revocable Living Trust; Britt Fontanari, Trustee of the Rudolph and Ethel Carol Fontanari Revocable Living Trust; Kimberly Gross, Trustee of the Rudolph and Ethel Carol Fontanari Revocable Living Trust; and Pear Park Baptist Church, Trustee of the Rudolph and Ethel Carol Fontanari Revocable Living Trust,

Plaintiffs-Appellants,

v.

Snowcap Coal Company, Inc., a Delaware corporation,

Defendant-Appellee.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LUM
Freyre and Grove, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 14, 2024

---

Rider & Quesenberry, LLC, Stephanie Rubinstein, Grand Junction, Colorado, for Plaintiff-Appellants

Hoskin Farina & Kampf, Andrew H. Teske, John T. Pryzgoda, Grand Junction, Colorado; Curtis, Justus & Zahedi, LLC, John P. Justus, Westminster, Colorado, for Defendant-Appellee

¶ 1 Plaintiffs, Brett Fontanari, Britt Fontanari, Kimberly Grosse and Pear Park Baptist Church, Trustees of the Rudolph and Ethel Carol Fontanari Revocable Living Trust (Fontanari), appeal the judgment in favor of defendant Snowcap Coal Company, Inc. (Snowcap), following a bench trial on Snowcap's breach of contract claim. We affirm the judgment and remand with directions for the district court to consider reasonable appellate attorney fees.

## I. Background

¶ 2 In 2002, Snowcap acquired the Roadside Portals Mine (the mine) and associated real property subject to reclamation under the Colorado Surface Coal Mining Reclamation Act (the Act), section 34-33-101 to -137, C.R.S. 2024. Snowcap holds a permit issued pursuant to the Act, under which it is responsible for conducting the reclamation work. As required by the Act, Snowcap posted a performance bond to ensure the completion of reclamation. *See* § 34-33-113, C.R.S. 2024.

¶ 3 About a year later, Snowcap entered into a Purchase and Sale Agreement (PSA) to convey to Fontanari an approximately 226-acre portion of Snowcap's property within the reclamation boundary. The PSA contained an "as is, where is" clause under which

1

Fontanari agreed that it would rely solely on its own inspection to determine the condition of the property. Additionally, it contained a broad indemnity provision stating that Fontanari

> shall release, indemnify, hold harmless, and defend [Snowcap] . . . from and against any and all claims, demands, losses, liabilities, damages, fines, penalties, costs and expenses (including without limitation, costs for site remediation, and costs for reasonable attorney fees) . . . arising or alleged to arise in any manner whatsoever from any condition on or under the [property].

Finally, the PSA granted Snowcap an easement to access the property for the purpose of performing its reclamation obligations.

¶ 4    In 2013, Snowcap submitted a bond release application to the Division of Reclamation, Mining, and Safety (DRMS) with respect to lands on the property. Fontanari objected to the bond release because of concerns related to "subsidence features" on the land and their effect on irrigation.

¶ 5    The next year, Fontanari dug a trench on the property, which allowed water to enter one of the mine shafts and partially saturate the mine, a condition called "hydrologic communication." The hydrologic communication caused public safety concerns and generated additional objections to the bond release from Fontanari.

2

DRMS ordered Snowcap to submit an application for a permit revision that would require it to investigate the hydrologic communication, prepare a plan to repair it, prepare a reclamation plan for any resulting disturbances, and commit to completing the repairs and reclamation.

¶ 6 J.E. Stover & Associates (Stover), Snowcap's "onsite representative," prepared the permit revision application, undertook the other related tasks, and communicated with DRMS.

¶ 7 DRMS approved the permit revision. Snowcap also submitted the proposed plan for repair and reclamation to DRMS. Fontanari submitted objections and proposed an alternative plan. DRMS rejected Fontanari's plan and issued a decision approving Snowcap's plan. Fontanari sought review of the DRMS decision before the Mined Land Reclamation Board (MLRB). After a two-day hearing, the MLRB affirmed the DRMS decision. Fontanari then filed an action in Mesa County Case No. 17CV30391 seeking judicial review of the MLRB order. The district court affirmed the MLRB order and awarded Snowcap statutory attorney fees. Fontanari appealed the attorney fee award to a division of this

court.[1]  We will refer to these proceedings collectively as the "DRMS proceedings."

¶ 8     While the DRMS proceedings were ongoing, Fontanari filed the underlying action against Snowcap, alleging breach of contract (for the permit revision) and failure to maintain subjacent support. Fontanari's claims generally alleged that sinkholes and other conditions on the property prevented it from irrigating the property and adjacent lands using flood irrigation and required it to use a pipe and sprinkler irrigation method, resulting in added costs. Fontanari also sought declaratory relief, asking the court to interpret the terms of the PSA and the revised permit.

¶ 9     Snowcap asserted a number of counterclaims, including, as relevant here, a breach of contract claim alleging that Fontanari breached (or would breach) the indemnity provision by refusing to compensate Snowcap for costs and expenses, including reclamation costs and attorney fees, incurred (1) as a result of the hydrologic

---

[1] The division reversed the award of statutory attorney fees and remanded to the district court. *Fontanari v. Snowcap Coal Co.*, 2023 COA 29.  The case is stayed in the district court pending the outcome of this appeal.

4

communication; (2) during or as a result of the DRMS proceedings; and (3) in defending against Fontanari's claims in the instant case.

¶ 10    All of Fontanari's claims and most of Snowcap's counterclaims were dismissed, leaving only Snowcap's breach of indemnity provision claim (indemnity enforcement claim).

¶ 11    Fontanari moved to dismiss the indemnity enforcement claim under C.R.C.P. 12(b)(5), which the district court denied. Later, Fontanari filed a summary judgment motion arguing that the indemnity provision was ambiguous and that it only applied to claims made by third parties against Snowcap — not to claims between Fontanari and Snowcap or claims arising out of Fontanari's behavior. Fontanari also argued that the indemnity provision was void as a matter of public policy. The district court rejected Fontanari's arguments, concluding that (1) the indemnity provision unambiguously made Fontanari responsible for the additional reclamation costs and related litigation expenses and (2) public policy didn't render the provision void.

¶ 12    During trial, after Snowcap's case-in-chief, Fontanari moved again for dismissal of the indemnity enforcement claim based on Fontanari's interpretation of the indemnity provision. The court

denied the motion. After trial, the district court found that Fontanari breached the indemnity provision and awarded Snowcap a total of $517,906.39 in damages, most of which were attorney fees, including fees incurred "up to the trial" in the underlying litigation. The court later entered a separate award for $49,218.17 in attorney fees incurred during trial and for closing arguments.

¶ 13   On appeal, Fontanari argues that the district court erred by concluding that (1) the PSA unambiguously imposed an indemnity obligation on Fontanari for the fees and costs incurred by Snowcap and (2) the fees and costs incurred during trial and for closing argument were reasonable.[2]

## II.   Indemnity Provision

¶ 14   Fontanari first contends that the district court erred by finding that the PSA's indemnity provision is unambiguous and that it requires Fontanari to pay the fees and costs incurred by Snowcap. We disagree.

---

[2] In its opening brief, Fontanari also argued that the district court erred by concluding that the indemnity provision didn't violate public policy; however, it withdrew this issue in its reply brief.

## A.    Additional Facts

Section 13.B of the PSA provides:

> From and after the date of Closing, [Fontanari] . . . shall release, indemnify, hold harmless, and defend [Snowcap] . . . against any and all claims, demands, losses, liabilities, damages, fines, penalties, costs and expenses (including without limitation, costs for site remediation, and costs for reasonable attorney fees) known or unknown, arising or alleged to arise in any manner whatsoever from any condition on or under the [property], or the failure of the [property] to comply with applicable environmental laws and regulations . . . , or arising or alleged to arise from any claim for damage to any property, including loss of use thereof, or which [Snowcap] may sustain or incur in connection with any litigation, investigation, or other expenditures incident to any of the foregoing, including any suit instituted to enforce this agreement of indemnity . . . .  This indemnification obligation and release and waiver shall survive the Closing of the sale/purchase of the Premises.

¶ 15    The damages awarded by the district court under this provision were broken into four categories: (1) $151,730.61 for fees Snowcap paid to Stover for Stover's work related to the hydrologic communication and related administrative proceedings (Stover fees); (2) $198,454.58 in attorney fees incurred during the DRMS proceedings and in relation to Fontanari's bond release objections;

7

(3) $67,721.20 in attorney fees incurred to defend against Fontanari's dismissed claims in the underlying litigation; and (4) $100,000 in attorney fees incurred "up to the time of trial" — and $49,218.17 in attorney fees incurred during trial and for post-trial work — related to Snowcap's prosecution of its indemnity enforcement claim.

### B. Standard of Review and Applicable law

¶ 16 "The primary goal of contract interpretation is to determine and give effect to the intent of the parties," which we determine "primarily from the language of the instrument itself." *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). A contract that is unambiguous "will be enforced according to [its] plain language." *Id.*

¶ 17 The terms of a contract are ambiguous when they are "susceptible to more than one reasonable interpretation." *Id.* However, the mere fact that the parties disagree about the interpretation of the contract does not itself create ambiguity. *Id.* at 376-77.

¶ 18 Whether a written contract is ambiguous is a question of law that we review de novo. *Lake Durango Water Co. v. Pub. Utils.*

8

*Comm'n*, 67 P.3d 12, 20 (Colo. 2003). We also review de novo the interpretation of unambiguous contractual language, including the language of indemnity provisions. *Id.*; *see also Boulder Plaza Residential, LLC v. Summit Flooring, LLC*, 198 P.3d 1217, 1220-21 (Colo. App. 2008) (indemnity agreements subject to same rules of construction governing contracts generally).

## C.    Analysis

¶ 19    We agree with the district court that the language of the indemnity provision unambiguously requires Fontanari to indemnify Snowcap for each of the four categories of damages the court awarded.

¶ 20    The provision is very broad, but none of its words, either in isolation or in context, are confusing or susceptible of more than one reasonable interpretation. *See Sunshine v. M. R. Mansfield Realty, Inc.*, 575 P.2d 847, 849 (Colo. 1978) (when there is only one reasonable meaning of a contract term, the parties are bound by that meaning). The provision says that Fontanari must indemnify Snowcap against "*any and all* claims . . . costs and expenses" (Emphasis added)

9

- "arising or alleged to arise in any manner whatsoever from any condition on or under the [property] or the failure of the [property] to comply with applicable environmental laws and regulations";

- "arising or alleged to arise from any claim for damage to any property"; and

- incurred "in connection with any litigation" related to "any of the foregoing, including any suit initiated to enforce [the indemnity provision]."

¶ 21    Further, the provision specifies that the "costs and expenses" for which Fontanari may be liable "includ[e], *without limitation,* costs for site remediation[] and costs for reasonable attorney fees." (Emphasis added.)

¶ 22    The first two categories of damages — the Stover fees and the attorney fees for DRMS proceedings — arise out of the investigation, monitoring, repair, reclamation, and administrative proceedings necessitated by the hydrologic communication, along with the related litigation initiated by Fontanari after DRMS approved Snowcap's revised plan.  The hydrologic communication is a "condition on or under the property."  In addition, that condition

10

caused Snowcap to incur fees to ensure that the property "compl[ied] with applicable environmental laws and regulations." Further, to the extent fees in those categories also relate to Fontanari's 2013 objections to the bond release, those fees arise out of Fontanari's concerns about subsidence features, which are also a "condition on or under the property."

¶ 23 The third category of damages — the attorney fees incurred in defending against Fontanari's dismissed claims — also arises from litigation related to (1) a "condition on or under the property," namely, sinkholes, "surface subsidence," and related issues; and (2) a claim for damage to the property caused by those conditions.

¶ 24 The fourth category of damages — attorney fees for prosecuting Snowcap's indemnity enforcement claim — are incurred in connection with a "suit initiated to enforce" the indemnity provision.

¶ 25 In sum, all four categories of damages are expressly covered under the indemnity provision's plain language.

¶ 26 To the extent we understand Fontanari's arguments to the contrary, we aren't persuaded by them. First, Fontanari argues that the indemnity provision is ambiguous (and must be construed

11

against Snowcap as the drafter) because the district court made "contradictory findings" about ambiguity in its order denying the motion to dismiss and its order denying summary judgment.

¶ 27    Fontanari's claim is based on language in the dismissal order saying, "*When* an agreement is ambiguous, a determination of the parties' intent . . . is a question of fact." (Emphasis added.) Fontanari contrasts this with the district court's summary judgment order concluding that the agreement was unambiguous. We agree with Snowcap that, in context, the language in the dismissal order is a simple statement of the law, not a conclusion that the contract was ambiguous. Neither party argued that the contract was ambiguous in the motion to dismiss or response thereto. Rather, Fontanari argued that the interpretation of the indemnity provision was governed by a line of Colorado cases articulating a "general rule" that such provisions applied only to claims asserted by third parties.[3] The court disagreed with Fontanari's interpretation and denied the motion. And in any event, we discern no ambiguity in our de novo review.

---

[3] Fontanari doesn't reassert this argument on appeal.

¶ 28    Second, Fontanari contends that the district court's interpretation of the indemnity provision — requiring Fontanari to pay for the fees and costs at issue here — is unreasonable because Snowcap provided Fontanari with notice and an opportunity to comment on its proposed bond release in 2013.[4]  We don't perceive that submitting a legally required public notice and opportunity to comment to all "adjoining property owners, surface owners, appropriate governmental bodies," and various other administrative agencies is inconsistent with Fontanari's obligations under the indemnity provision.  Nor does it render the district court's interpretation unreasonable.

¶ 29    Third, Fontanari contends that the provision is ambiguous because some of the district court's factual findings about the timing of Snowcap's indemnification demands were contradicted by portions of the record.  But Fontanari doesn't explain, and we can't discern, why this compels a conclusion that the contract is

---

[4] When making this argument, Fontanari references the "number of times Snowcap provided notice" of its right to object but does not provide any citation to the record.  As best we can discern, the only reference in Fontanari's briefing to a notice of objection rights provided by Snowcap is the notice of application for bond release in 2013.

13

ambiguous. *Cf. People v. Sanders*, 2023 CO 62, ¶ 16 (noting that we do not consider "bald legal propositions" presented without supporting authority, argument, or development).

¶ 30     Finally, Fontanari contends that the indemnity provision is ambiguous in light of a provision in the PSA giving Snowcap an easement to enter the property to perform its reclamation obligations. We decline to consider this argument because it was raised for the first time in the reply brief. *See Knappenberger v. Shea*, 874 P.2d 498, 503 (Colo. App. 1994) (issues not presented in an opening brief generally are not considered by the court).

¶ 31     For all these reasons, the district court didn't err by concluding that the PSA unambiguously required Fontanari to pay the fees and costs it awarded.

### III.   Reasonableness of Attorney Fees

¶ 32     Fontanari next contends that the district court erred by awarding attorney fees to Snowcap incurred during trial and for post-trial work. We again disagree.

### A.   Standard of Review and Applicable Law

¶ 33     We review an attorney fee award for an abuse of discretion and will not disturb it unless it is patently erroneous or unsupported by

14

the evidence.  *CAW Equities, LLC v. City of Greenwood Village*, 2018

COA 42M, ¶ 38.

B.    Analysis

¶ 34    To the best of our understanding, Fontanari contends that,

when the district court reduced Snowcap's pre-trial attorney fees

from $250,324.48 to $100,000, it concluded that $100,000 was the

maximum amount of attorney fees it was reasonable to expend in

enforcing the indemnification provision.  Thus, Fontanari argues,

the court erred by entertaining and granting any further attorney

fees for trial and post-trial work.

¶ 35    We disagree with Fontanari's interpretation of the district

court's order.  The order did not say (or even imply) that $100,000

was a cap on reasonable fees for the enforcement proceedings.

Instead, it said that $100,000 was a reasonable amount that "still

recognize[d] the substantial work that did go into *this portion of the*

*case*." (Emphasis added.)  The court later expressly explained that

the parties were "entitled to a hearing on the final portion of the

attorney fees for the trial and . . . post-trial work and expenses."

¶ 36    Because Fontanari doesn't raise any other argument as to why

the $49,218.17 in attorney fees awarded for trial and post-trial

15

work is unreasonable, we affirm the district court's order awarding those fees.

## IV. Reasonable Appellate Attorney Fees

¶ 37 Snowcap also requests an award of its reasonable appellate attorney fees and costs incurred in defending against this appeal under C.A.R. 39.1. Snowcap argues that it is entitled to such fees because "[t]his appeal is a continuation of litigation by Snowcap to enforce Fontanari's indemnity obligation of the PSA." We agree. *Kennedy v. King Soopers Inc.*, 148 P.3d 385, 390 (Colo. App. 2006) ("When a party is awarded attorney fees for a prior stage of the proceedings, it may recover reasonable attorney fees and costs for successfully defending the appeal."). We exercise our discretion under C.A.R. 39.1 and remand the case to the district court for a determination of reasonable appellate attorney fees. *Wheeler v. T.L. Roofing, Inc.*, 74 P.3d 499, 506 (Colo. App. 2003).

## V. Disposition

¶ 38 We affirm the judgment and remand for further proceedings consistent with this opinion.

JUDGE FREYRE and JUDGE GROVE concur.