ENVIRONMENTAL DEFENSE FUND, INC., Plaintiff-Appellee,

v.

COLORADO DEPARTMENT OF HEALTH, Division of Administration of the Colorado Department of Health, Colorado Air Quality Control Commission, and Colorado Air Pollution Control Division, Defendants-Appellants,

and

The Committee on Oil Shale of the Rocky Mountain Oil and Gas Association, Intervenor-Defendant-Appellant.

No. 85CA0149.

Colorado Court of Appeals, Div. III.

Nov. 6, 1986.

Robert E. Yuhnke, Regional Counsel, Boulder, for plaintiff-appellee.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Robert A. Hykan, Asst.

Atty. Gen., Denver, for defendants-appellants.

Hultin & Spaanstra, Carolyn L. Buchholz, Denver, for intervenor-defendant-appellant.

KELLY, Judge.

In this action for declaratory and injunctive relief in construing a statute, the defendants, the Colorado Department of Health, the Administration Division of the Colorado Department of Health, the Colorado Air Quality Control Commission, and the Colorado Air Pollution Control Division, appeal from the summary judgment entered for the plaintiff, Environmental Defense Fund, Inc. The intervenor, The Committee on Oil Shale of the Rocky Mountain Oil and Gas Association, joins the defendants in this appeal.

The defendants contend that the trial court erred in holding that the defendant Air Quality Control Commission exceeded its statutory authority in promulgating regulations which allow variances from sulfur dioxide ($SO_2$) emission standards. The trial court order granting summary judgment invalidated Air Quality Control Commission Regulation No. 3, 5 Code Colo.Reg. 1001–5, §§ VIII.B, XIV.D, E., and F. We reverse.

The issue in this case is whether the variance procedure authorized by § 25–7–207, C.R.S. (1982 Repl.Vol. 11) for Class I areas was intended by the General Assembly to apply to *all* Category 1 areas specified in § 25–7–209(1)(b), (d) and (e), C.R.S. (1982 Repl.Vol. 11). This issue is rooted in federal and state legislative efforts to lessen air pollution.

In areas of the United States where ambient air quality already meets federal standards, the Federal Clean Air Act, 42 U.S.C. § 7470, et seq. (1983) (the CAA), requires each state to develop a prevention of significant deterioration (PSD) program which will maintain the state's air quality at or near its current level. Under the CAA, the state's PSD program is to be included in a state implementation plan which must receive overall approval from the Environmental Protection Agency (EPA). States which do not enact PSD programs or whose implementation plans fail to meet federal standards will have their air quality programs administered by the EPA.

To forestall this federal intervention, the Colorado General Assembly in 1979 enacted PSD legislation in H.B. 1109. *See* § 25–7–201, et seq., C.R.S. (1982 Repl.Vol. 11). The statute empowers the defendant Commission to promulgate regulations implementing the PSD program. Section 25–7–203 and § 25–7–207, C.R.S. (1982 Repl. Vol. 11).

Both federal and state programs divide areas with satisfactory air quality into classes: I, II, and III. Within each class, the PSD statutes establish increments which mandate the maximum amount of additional pollution from $SO_2$ and suspended particulate matter beyond a fixed level known as the baseline concentration. The smallest increments, and thus the maximum air quality protection, are permitted in Class I areas.

The CAA has designated twelve mandatory Class I areas in Colorado. These areas generally consist of large national parks, national monuments, and federal wilderness areas. The rest of the state is designated by the CAA as either Class II or Class III areas. Under the CAA, Colorado may redesignate some of its Class II or Class III areas into the other classes. Redesignations must receive federal approval; however, Colorado's Air Quality Control Act names eight Class II federal properties as "Category 1" areas, which receive Class I $SO_2$ protection without going through the redesignation process. At the time the Commission promulgated the regulation at issue here (Reg. 3), the EPA had not approved the state's implementation plan; therefore, Colorado's air quality program was still under dual administration. Thus, federal law and regulations apply where state law and regulations are either incomplete or implementation plans have not been approved.

The CAA authorizes federal and state officials to grant variances from pollution increments within Class I areas if applicants certify there will be no overall adverse impact on air quality in affected areas. The variance authority applies in federally-mandated Class I areas, as well as in areas which states have redesignated as Class I.

Following CAA amendments in 1977, the Commission promulgated ambient air quality standards for Colorado which included $SO_2$ increments for its Category 1 areas. The Commission designated eighteen Category 1 areas for $SO_2$ increments which matched Class I increments under the federal act. Twelve of the eighteen Category 1 areas are geographically identical to the twelve federally-mandated Class I areas.

Section 25–7–208, C.R.S. (1982 Repl.Vol. 11) designates all areas of the state as originally provided by the CAA, except for the Class II federal lands designated Category 1 by the Commission in 1977. *See* § 25–7–209, C.R.S. (1982 Repl.Vol. 11). The General Assembly excluded suspended particulate matter increments from § 25–7–209, C.R.S. (1982 Repl.Vol. 11) because legislators believed the federal act should have differentiated between different forms of particulate matter.

In 1983, the Commission published Reg. 3, which adopts the federal classification of state areas by designating them as *Category* 1, 2, and 3 with the exception of the Class II federal lands which are also designated as Category 1. Reg. 3 also provides for variances from the $SO_2$ increments in all Category 1 areas. The Reg. 3 variance procedure is modeled on the same procedure allowed by the CAA. *See* 42 U.S.C. § 7475 (1983).

Because § 25–7–209, C.R.S. (1982 Repl. Vol. 11) does not specifically mention the variance procedure, the Environmental Defense Fund sued for declaratory and injunctive relief. In its motion for summary judgment, the Fund asserted that the variance procedure in § 25–7–207, C.R.S. (1982 Repl.Vol. 11) does not apply to Category 1 areas and that the Commission exceeded its statutory authority by making the provision in Reg. 3. In its interpretation of the statute, the trial court found that the General Assembly did not intend to include the variance procedure for Category 1 areas. Thus, the court concluded that the Commission lacked statutory authority to include variances in Reg. 3, and it issued a restraining order prohibiting the Commission from granting any permits under Reg. 3 for Category 1 areas. The defendants appeal only on the issue of statutory interpretation.

The Commission argues that the trial court failed to apply the rules of statutory construction properly in determining legislative intent with regard to the state PSD statute. We agree.

No rule or regulation issued by an administrative agency is valid unless the power has been delegated to it by law. Section 24–4–103, C.R.S. (1982 Repl.Vol. 10). Section 25–7–207, C.R.S. (1982 Repl.Vol. 11) requires the Commission to establish procedures for granting variances for the construction and operation of major sources and modifications which would exceed the maximum allowable increments of $SO_2$ or suspended particulate matter for Class I areas. The permit will be granted only if the owners or operators of the source can establish that air quality in the affected area will not deteriorate below the national standards for that area. Section 25–7–207, C.R.S. (1982 Repl.Vol. 11).

The state's policy is "to prevent the significant deterioration of air quality in those portions of the state where the air quality is better than the national ambient air quality standards...." Section 25–7–201, C.R.S. (1982 Repl.Vol. 11). If construction or modification of major sources of suspended particulates and $SO_2$ could cause the levels of these pollutants to exceed baseline concentrations in Class I, II, or III areas, the allowable increments will be the same as those established by the CAA except as provided by § 25–7–209, C.R.S. (1982 Repl.Vol. 11). That section requires that $SO_2$ concentration increases in Class II areas which the Commission designated

Category 1 in 1977 will be the same as the Class I increments established by the CAA, but it makes no mention of the variances allowed by § 25–7–207, C.R.S. (1982 Repl. Vol. 11).

If the meaning of a statute is plain and unambiguous, the statutory language is not subject to construction. *American Metal Climax, Inc. v. Claimant in re Death of Butler*, 188 Colo. 116, 532 P.2d 951 (1975). A latent ambiguity exists in a statute, however, if two or more meanings are possible despite the use of clear and intelligible language. *Black's Law Dictionary* 105 (Rev. 4th ed. 1968).

In interpreting an ambiguous statute, the court may consider such factors as (1) the object to be obtained; (2) the circumstances surrounding enactment of the statute; (3) former statutes on the subject; (4) the consequences of statutory construction; and (5) the legislature's declaration of purpose. Section 2–4–203, C.R.S. (1980 Repl. Vol. 1B).

■ Courts faced with interpreting a statute which establishes an agency-administered program must carefully consider the contemporaneous construction of the statute adopted by the administrative officials charged with its enforcement. *Dodge v. Department of Social Services*, 657 P.2d 969 (Colo.App.1982). Statutory enactments and agency regulations regularly promulgated under those statutes are presumed valid and may be set aside only if proven invalid beyond a reasonable doubt. *Augustin v. Barnes*, 626 P.2d 625 (Colo.1981); *Fry Roofing Co. v. Department of Health*, 179 Colo. 223, 499 P.2d 1176 (1972).

■ The fundamental rule of statutory construction is to determine the General Assembly's intent and, if possible, to give effect to every word of the statute by reading the act as a whole. *Johnston v. City Council*, 177 Colo. 223, 493 P.2d 651 (1972); *see Humana, Inc. v. Board of Adjustment*, 189 Colo. 79, 537 P.2d 741 (1975). A reviewing court must liberally construe general provisions of the statute to give full effect to the General Assembly's intent. Section 2–4–212, C.R.S. (1980 Repl.

Vol. 1B). *See Travelers Indemnity Co. v. Barnes*, 191 Colo. 278, 552 P.2d 300 (1976). Finally, the court must also consider what the statute was designed to accomplish and "the consequences that would follow from alternative constructions." *Dodge v. Department of Social Services, supra.*

It is uncontroverted that the General Assembly, through the Air Quality Control Act of 1970, created the Commission and authorized it to implement and regulate a state air pollution control program. In 1977, the Commission adopted the category area system which was similar to the federal PSD program. In 1979, the General Assembly passed § 25–7–101, et seq., C.R.S. (1982 Repl.Vol. 11) with the intention of bringing Colorado's air pollution control program into line with the CAA amendments of 1977.

■ The record and the legislative history of H.B. 1109 leave no doubt that the General Assembly intended for the variance procedure allowed by the CAA to be part of Colorado's PSD program. The General Assembly also intended to extend Class I $SO_2$ protection to Colorado's previously designated Category 1 areas; thus, it added § 25–7–209, C.R.S. (1982 Repl.Vol. 11) to indicate all federal properties in Colorado which were to receive this protection. Nowhere in their deliberations of H.B. 1109 did the House and Senate Transportation Committees limit the variance procedures contained in § 25–7–207, C.R.S. (1982 Repl. Vol. 11) to federal Class I areas only. The entire legislative history of H.B. 1109 is devoid of any indication that the General Assembly intended to preclude application of the variance procedure to the Category 1 areas.

Section 25–7–207, C.R.S. (1982 Repl.Vol. 11) directs the Commission to promulgate variance procedures for Class I areas. In addition, the General Assembly intended to treat the Category 1 areas identically to Class I areas for $SO_2$ protection. Thus, a logical reading of the statute as a whole leads us to conclude that the variance procedures were authorized for both Category 1 and federally-mandated Class I areas.

It is also significant that, when H.B. 1109 was passed, Colorado did not have its own PSD program in effect. The drafters of the bill knew that, without an approved state program, the federal government would administer Colorado's clean air program. The legislative history of H.B. 1109 establishes that the General Assembly intended that only state agencies would administer the air pollution program. Colorado Legislative Council, Research Publ. No. 237, *Report to the Colorado General Assembly: Recommendations for 1979 Committee on Air Pollution* (December 1978). The drafters of H.B. 1109 stated that it was "important to have a *Colorado law in compliance with the CAAA* [Clean Air Act Amendments of 1977] in order to alleviate problems of dual enforcement." Research Publ. No. 237, *supra* (emphasis added).

The legislative history establishes that, as originally drafted, H.B. 1109 did not include § 25–7–209. If this section had not been added, Colorado would have had to follow the original federal class designations for all its attainment areas. The 1977 Category 1 areas would have automatically reverted to Class II $SO_2$ protection levels. State officials discovered, however, that a major new industrial source was about to be constructed in Utah near Dinosaur National Monument in the northwestern corner of Colorado. Dinosaur was one of the Category 1 areas that would revert to Class II under the original H.B. 1109 draft. The drafters of H.B. 1109 recognized that the source in Utah could be in operation before Colorado's PSD program was federally approved and before the Commission could redesignate its Category 1 areas as Class I.

Federal law requires that a state in which a new source is constructed must honor a neighboring state's existing classification of its air quality attainment areas. Without § 25–7–209, it might later be impossible to secure Class I air quality protection for such areas as Dinosaur National Monument. The General Assembly added the section to guarantee that the Category 1 areas would receive Class I $SO_2$ protection under existing state law even if the EPA did not give timely approval to Colorado's PSD program. *See* § 25–7–210, C.R.S. (1982 Repl.Vol. 11). Nothing in the state statute or its legislative history indicates that the Category 1 areas are to be given better air protection than Class I areas, which would be the case if we affirm the trial court's construction of § 25–7–201, et seq., C.R.S. (1982 Repl.Vol. 11). *See* § 25–7–108, C.R.S. (1982 Repl.Vol. 11).

Giving full consideration to the legislative history of the act and reading the statute as a whole, we conclude that the Commission reasonably interpreted and applied its statutory authority in promulgating the regulations governing variance procedures. *See* § 2–4–212, C.R.S. (1980 Repl. Vol. 11). Where, as here, the statutory grant of authority is implicit rather than explicit, the court cannot substitute its judgment for the reasonable interpretation of the administrative agency. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The judgment is reversed and the cause is remanded to the trial court with directions to enter summary judgment upholding the validity of Air Quality Control Commission Regulation No. 3, §§ VIII.B, XIV.D., E., and F.

TURSI and BABCOCK, JJ., concur.