25CA1537 Lotus Church v 5071 Inc 06-25-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA1537
Jefferson County District Court No. 24CV31080
Honorable Jeffrey R. Pilkington, Judge

---

Lotus Church Ranch LLC, MK Church Ranch LLC, and KC Church Ranch LLC,

Plaintiffs-Appellees,

v.

5071 Inc., d/b/a Caliper Holdings,

Defendant-Appellant.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE KUHN
Freyre and Bernard*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 25, 2026

---

Coaty and Woods, P.C., John D. Coaty, Tony Basile, Dylan Woods, Jayna Patel, Denver, Colorado, for Plaintiffs-Appellees

Berg Hill Greenleaf Ruscitti, LLP, Rudy E. Verner, Benjamin M. Wilson, Andrew C. Fischer, Boulder, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2025.

¶ 1     Defendant, 5071 Inc., d/b/a Caliper Holdings, appeals the trial court's judgment in favor of plaintiffs, Lotus Church Ranch LLC, MK Church Ranch LLC, and KC Church Ranch LLC (collectively, Lotus).  We affirm.

## I.     Background

¶ 2     In December 2019, Caliper entered into a lease agreement with Potens Partners, LLC, for office space.  Among other obligations, the lease agreement required Caliper to pay rent "and its share of operating costs."  Potens, as the landlord, was required to "keep and maintain [the premises] in good repair and working order."

¶ 3     In May 2020, Caliper emailed Potens about a water leak near the windows in its suite.  Potens promptly responded and had an individual stop by the office to fix the leak.  In July 2021, Caliper again emailed Potens about "two ceiling leaks along the windows" after experiencing heavy rains.  Potens responded shortly after and said that it was "working towards resolving the issue and [had] bid out vendors for the repair."

¶ 4     On March 25, 2022, Caliper emailed Potens about "a new sizable leak" (the New Leak) in the ceiling.  Potens responded to the

1

email and said that it would send somebody to address the leak "as soon as possible." On March 31, Caliper emailed Potens and thanked it for its "quick resolution" in getting the New Leak fixed. In the email, Caliper also stated that when Potens's maintenance personnel, Jose, fixed the New Leak, he noted that the leak near the windows (the Ongoing Leak) was "*still* occurring despite the numerous attempted repairs."

¶ 5     In the spring of 2022, Potens sold its property, including the leased office space, to Lotus. During the pendency of the sale and "[a]s part of the due diligence surrounding the purchase, [Caliper was] required to complete a Tenant Estoppel Certificate ('TEC')." Caliper's staff signed the TEC in front of a notary.[1] In the TEC, Caliper agreed that there were no existing defaults or breaches of the lease by Potens.

¶ 6     In May 2022, Caliper's legal counsel asked for a meeting with Lotus's new property manager. Counsel indicated he wanted to talk about "efforts to find a subtenant, the [Ongoing Leak,] . . . and

---

[1] Caliper's staff signed the TEC on March 22, 2022 — before Caliper sent Potens the March 25 and March 31 emails notifying Potens about the New and Ongoing Leaks.

different alternatives to termination of the lease." Lotus learned about the Ongoing Leak as a result of those conversations. It subsequently investigated the issue and scheduled vendors to help remediate the Ongoing Leak.

¶ 7 Then in early June 2022, Caliper moved out of the premises. On June 30, Caliper emailed a letter to Lotus purporting to terminate the lease "pursuant to Article 27, Landlord's Default and Right to Cure, for violation of Article 17." Caliper also stopped paying rent. Lotus rejected Caliper's attempted termination of the lease and reminded Caliper that it was still bound to the terms of the lease.

¶ 8 In July 2024, Lotus filed suit against Caliper, seeking unpaid rent through the end of Caliper's lease in April 2025. Caliper answered, asserting numerous defenses and three counterclaims. One of the counterclaims, as relevant here, was a breach of contract claim in which Caliper alleged that Lotus failed to commence repairs for the Ongoing Leak within thirty days of being notified, as required by the lease agreement.

¶ 9 After a bench trial, the trial court ruled in favor of Lotus. This appeal followed.

## II.    Analysis

¶ 10     Caliper contends that the trial court erred because it (1) found that Lotus was not in default of the lease agreement when Caliper terminated the lease and (2) added a materiality requirement when interpreting the default clause in the lease agreement.  Both parties also contend that (3) they are entitled to their attorney fees under C.A.R. 39.1.  We address each issue in turn.

### A.    Applicable Law and Standard of Review

¶ 11     "The primary goal of contract interpretation is to determine and give effect to the intent of the parties." *Ad Two, Inc. v. City & County of Denver*, 9 P.3d 373, 376 (Colo. 2000).  To determine the intent of the parties, we primarily look at the language of the agreement.  *Id.*  "[C]ontract interpretation is a question of law that is reviewed de novo[,] and we need not defer to a lower tribunal's interpretation of the contract." *Id.*

¶ 12     "We review a judgment following a bench trial as a mixed question of fact and law.  We defer to the court's findings of fact unless they are clearly erroneous, and we review the court's conclusions of law de novo." *Premier Members Fed. Credit Union v. Block*, 2013 COA 128, ¶ 27 (citation omitted).  A court's finding of

fact is clearly erroneous only when it has no record support. *Cronk v. Bowers*, 2023 COA 68M, ¶ 12.

### B. Lotus's Default

¶ 13    Caliper first contends that the trial court erred by not finding that Lotus was in default of the lease agreement. More specifically, Caliper argues that (1) its March 31 email constituted written notice under Article 27;[2] (2) Potens and Lotus failed to commence repairs within thirty days of Caliper's March 31 email; and (3) the "trial court's findings regarding Caliper's supposed non-leak motivations for terminating the Lease [are] irrelevant."

### 1. Additional Background

¶ 14    As the trial court noted, there was a history of leaks at the premises. There appear to be four leaks that Caliper notified the

---

[2] Lotus argues that Caliper's emails did not constitute written notice because, under Article 33 of the lease agreement, written notice must be in writing, sent either by the United States Postal Service as registered or certified mail or by overnight express courier. However, because the parties don't dispute that Lotus received actual notice of the leak issues from the emails, like the trial court we assume, without deciding, for the purposes of our analysis that the emails constituted sufficient notice under the lease.

previous landlord, Potens, about.  But ultimately only two of those leaks are relevant to our analysis.

¶ 15     The first leak occurred in May 2020.  After receiving notice, Potens had somebody fix the leak.  It appears that this leak was resolved.  Caliper does not claim that the May 2020 leak was a default under the lease agreement.

¶ 16     The second leak occurred in July 2021 after heavy rains.  Caliper claimed that there were multiple leaks near some of the windows.  After Caliper notified Potens of the second leak, Potens replied and said that it was working towards resolving the issue and had "bid out vendors for the repair."  The trial court found that it was unclear whether the July 2021 leak was related to, or a continuation of, the May 2020 leak.  However, like the May 2020 leak, Caliper doesn't cite the July 2021 leak as a basis for default.

¶ 17     Then, on March 25, 2022, Caliper emailed Potens about the New Leak.  Potens had someone fix the leak, and Caliper thanked Potens for the "quick resolution."  Caliper also does not cite the New Leak as a basis for default.

¶ 18     However, while Potens's maintenance man, Jose, was working on the New Leak, he noted that there was still a leak near the

windows, the Ongoing Leak. He also replaced the stained ceiling tile next to the Ongoing Leak. On March 31, Caliper emailed Potens again about the Ongoing Leak near the windows, and Potens responded that it was still working to resolve the issue. Caliper claims that the Ongoing Leak was the leak that ultimately constituted a default under the lease agreement.

### 2. The Lease Agreement

¶ 19 Caliper argues that the trial court erred by finding that Lotus was not in default of the lease agreement. Several provisions of that lease agreement are relevant to our analysis.

¶ 20 Article 17.1 requires Lotus to maintain the premises, but it also requires Caliper to "promptly" provide Lotus with written notice of any problems. And Caliper must then allow Lotus "a reasonable time" to start repairs. The pertinent portions of Article 17.1 read as follows:

> Article 17 Maintenance and Repair
>
> 17.1 [Lotus] shall, subject to reimbursement for Operating Costs, *keep and maintain in good repair and working order*, reasonable wear and tear excepted: (1) structural elements of the Building; (2) standard mechanical (including HVAC), electrical, plumbing and fire/life safety systems

7

> serving the Building generally, together with air filters provided by [Lotus] for the HVAC serving the Premises, if any, and standard light fixtures provided by [Lotus] to the Premises, if any; (3) Common Areas; (4) the roof of the Building; (5) exterior windows of the Building; and (6) elevators serving the Building. *[Caliper] shall give prompt written notice of any required repairs to [Lotus] and [Lotus] shall have a reasonable time after receipt of such written notice in which to commence repairs.*

(Emphasis added.)

¶ 21    Article 27, in turn, addresses what happens if Lotus fails to perform its obligations under the agreement. If Lotus fails to commence repairs within a commercially reasonable time — presumptively thirty days — Caliper must provide written notice and an opportunity to cure. Only if Lotus fails to cure will it be found in default under the lease:

> Article 27. [Lotus's] Default and Right to Cure
>
> *[Lotus] shall not be in default unless [Lotus] fails to commence performance of obligations required of [Lotus] within a commercially reasonable time, but in no event later than thirty (30) days after written notice by [Caliper] to [Lotus] and to the holder of any first mortgage or deed of trust covering the Premises whose name and address shall have*

8

theretofore been furnished to [Caliper] in writing, specifying wherein [Lotus] has failed to perform such obligation; provided, however, that if the nature of [Lotus's] obligation is such that more than thirty (30) days are required for performance then [Lotus] shall not be in default if [Lotus] commences performance within such thirty (30) day period and thereafter diligently pursues the same to completion.

(Emphasis added.)

### 3. Caliper's March 31 Email

¶ 22    Caliper argues that its March 31 email satisfied Article 27's written notice requirement and notified Lotus that it had failed to perform its obligations under the lease. We disagree for several reasons.

¶ 23    Recall that under the lease agreement, Caliper had to give Lotus notice of an issue that needed to be repaired under Article 17.1. Only if Lotus failed to repair the issue could Caliper go on to give Lotus a notice of default and trigger a cure period under Article 27.

¶ 24    First, Caliper seems to argue that the emails it sent to Potens about the May 2020 leak and the July 2021 leak constituted written notice under Article 17.1 of the need to repair what

eventually became the Ongoing Leak. But that can't be the case. Caliper signed the TEC on March 22, 2022 — long after it notified Potens of those two leaks. And in the TEC, Caliper acknowledged that there was "no uncured default, event of default, or breach" by Potens or Caliper. Further, Caliper acknowledged that it "ha[d] no claim against [Potens] under the Lease and no offset or defense to the enforcement of the terms of the Lease." Accordingly, by signing the TEC, Caliper acknowledged that Potens had no existing default or failure to perform under the lease as of March 22, 2022. So Caliper can't rely on the May 2020 or July 2021 leaks as constituting notice under Article 17.1.

¶ 25     Second, Caliper argues that its March 31 email to Potens constituted notice of a failure to perform under Article 27. But the email contains no language supporting that suggestion. The email noted that the leak near the window was "*still* occurring" and that "it's been an issue for nearly the entire duration of [Caliper's] occupancy." But nowhere in the email did Caliper state that Potens had failed to perform, that Caliper was invoking Article 27, or that if Potens didn't cure within thirty days, Potens would be in default. The email simply notified Potens that the Ongoing Leak — contrary

to its representations in the TEC signed eight days earlier — was still an issue. Thus, at most, the March 31 email could have constituted notice under Article 17.1 that there was a problem that needed to be fixed.

¶ 26 But third — and critically — the March 31 email was sent to Potens, not Lotus. The trial court found that "[n]either Lotus [n]or [its property manager] had any knowledge of the prior water leaks or efforts to repair those leaks until early May 2022." This finding has record support and thus we have no basis to disturb it. *See Cronk*, ¶ 12. Given this finding, the March 31 email didn't constitute notice under either article.

¶ 27 Therefore, the trial court did not err by concluding that Caliper's March 31 email did not constitute written notice under Article 27.

### 4. Failure to Commence Repairs

¶ 28 Caliper next argues that the trial court conflated the New Leak Caliper emailed Potens about on March 25 with the Ongoing Leak near the windows that it emailed Potens about on March 31 into a single "Final Leak." And because the trial court conflated the two leaks, Caliper contends that the trial court erred by finding that

11

Potens commenced repairs when it replaced the ceiling tile for the New Leak but did not address the Ongoing Leak.

In its March 31 email, a Caliper representative wrote,

> I wanted to follow up and let you know that Jose came by on Friday and addressed the [N]ew [L]eak.  Thank you for your help with a quick resolution!  When he came by, he noted that the leak along the windows is *still* occurring despite the numerous attempted repairs.  He changed out the stained ceiling tile but I'm not sure if there is a plan to revisit this leak.

¶ 29    In this email, Caliper acknowledges that the New Leak was resolved but also noted a reoccurrence of the Ongoing Leak. Caliper said that Potens's maintenance man replaced the ceiling tile — apparently for the Ongoing Leak, not the New Leak.[3]

¶ 30    Nevertheless, we agree with Caliper that replacing the ceiling tile for the Ongoing Leak on March 25 didn't "commence repairs" for that leak.  When Potens responded to Caliper's March 31 email about the Ongoing Leak, it stated that it was "still working to get [the leaks near the windows] taken care of, as it turns out it seems

---

[3] Whether Potens changed the ceiling tile for the New Leak, the Ongoing Leak, or both leaks does not affect our subsequent analysis.

to be another entry point right when we think we have solved it." Therefore, Potens, and eventually Lotus, had thirty days *after* the March 31 email notifying them of the leak to commence repairs.[4] The March 25 ceiling tile replacement didn't commence repairs on Caliper's notice of the Ongoing Leak.

¶ 31 The trial court noted that Potens acknowledged that it was still working to get the Ongoing Leak taken care of before the sale to Lotus was complete. The trial court also found that once Lotus found out about the Ongoing Leak, it took further action. Caliper argues that Lotus's continued efforts to investigate the Ongoing Leak — after it found out about it — also didn't commence repairs. In particular, Caliper claims that the lease agreement required "effective response[s]" to their needs for repair, and not only the landlord's "best efforts." Caliper cites *5860 Chicago Ridge, LLC v. United States*, 104 Fed. Cl. 740 (2012), to support its assertion. In

---

[4] As we note *supra* Part II.B.3, while Caliper provided written notice about the May 2020 and July 2021 leaks, it acknowledged in the TEC that they had been resolved. It also appears from the record that there were multiple entry points for each leak near the windows. Accordingly, we conclude that the March 31 email about a leak near the window constituted a new notice for repairs under Article 17.1.

that case, which also involved ongoing water leaks, the United States Court of Federal Claims held that "the relevant clauses in the [l]ease did not merely command [the landlord's] diligence in responding to the [b]uilding's leaks; they demanded an effective response that would stop the leaks." *Id.* at 761. But that case, like this one, was highly fact intensive. We do not find *5860 Chicago Ridge* to be persuasive under these circumstances.

¶ 32 As the trial court found with record support here, when Lotus learned about the Ongoing Leak, it started its investigation into the issue. Lotus looked through the engineer's report to see if there was mention of a leak, had an individual inspect the leak and talk to a Caliper employee about the leak's history, sought to hire a plumber and roofer to inspect and resolve the issue, and recommended that the carpet be cleaned to remove "the stain." As the trial court noted, Lotus also scheduled vendors to investigate the leak and considered whether the building had ever been "wet sealed." The record, therefore, supports the trial court's finding that Lotus commenced repairs by investigating the root cause of the issue and hiring vendors to help resolve the matter. We perceive no clear error on this point.

14

## 5. Other Motivations For Terminating the Lease

¶ 33    Finally, Caliper argues that the trial court's findings about its "supposed non-leak motivations for terminating the Lease prove irrelevant." Caliper further argues that these non-leak-related motivations for terminating the lease "ha[ve] no bearing on whether [Lotus] was 'in default' under the Lease at the time Caliper terminated the Lease."

¶ 34    In its final judgment, the trial court noted that "[i]n trying to understand why Caliper abruptly vacated the Premises, it is important to understand Caliper's earlier efforts to get out of the Lease." The trial court then went on to explain that Caliper was in "grave financial distress" and had to take steps to reduce costs. For example, it laid off "a large portion of its employees and attempted to get relief from the Lease." Caliper also tried to sublease the premises, but to no avail.

¶ 35    We agree with Caliper that these facts are irrelevant to interpreting the language of the lease agreement itself. But in a bench trial, the court must assess the evidence and determine witness credibility. *Morris v. Belfor USA Grp., Inc.*, 201 P.3d 1253, 1258 (Colo. App. 2008). Those witness credibility determinations —

15

along with the inferences and conclusions to be drawn from the evidence — are within the trial court's province. *Id.* We do not agree that the trial court erred in any way by trying to understand the full situation and the motivations of the parties. To the contrary, understanding why the parties took the actions they took properly informed the court's factfinding. Moreover, these facts helped to contextualize the court's ruling: They help explain why the court found that Caliper vacated the premises "abruptly" and in the middle of Lotus's investigation and attempt to fix the Ongoing Leak. Accordingly, we disagree that the court erred by considering these facts in determining whether Lotus was in default.

### C. Materiality Standard for Breach

¶ 36 Caliper next contends that the "trial court erred when it added a materiality requirement to the default clause in the [lease agreement]."

### 1. Preservation

¶ 37 Lotus argues that Caliper waived or invited any error in connection with this issue. Lotus asserts that Caliper waived the materiality issue because it did not raise the issue in its post-trial motions. And Lotus argues that Caliper invited the error by asking

16

the trial court to equate "default" with "material breach" in its proposed findings of fact and conclusions of law.  In response, Caliper argues that "Colorado law does not prohibit a party from raising an issue on appeal that the party did not raise in post-trial motions."

¶ 38      In general, in order to preserve an issue for appeal, it must be "brought to the [trial] court's attention so that the court has an opportunity to rule on it."  *Grant Bros. Ranch, LLC v. Antero Res. Piceance Corp.*, 2016 COA 178, ¶ 11.  We generally will not review issues that were "not raised in or decided by a lower court . . . for the first time on appeal."  *Melat, Pressman & Higbie, L.L.P. v. Hannon L. Firm, L.L.C.*, 2012 CO 61, ¶ 18.

¶ 39      We can't say that Caliper waived this issue.  As Lotus points out, Caliper did bring the question to the trial court's attention in its proposed findings of fact and conclusions of law.  And Caliper was not required to address any error in a post-trial motion to preserve its appeal.  *See* C.R.C.P. 59(b) ("Filing of a motion for post-trial relief shall not be a condition precedent to appeal or cross-appeal, nor shall filing of such motion limit the issues that may be raised on appeal.").  And finally, we cannot say that Caliper invited

any error here.  Caliper asked the trial court to conclude that any default under the lease agreement constituted a material breach under contract law.  On appeal, it argues that the trial court misapplied that law and instead imported a materiality requirement into defaults under the lease agreement.  So it did not urge the trial court to adopt the error it complains of on appeal.  We therefore conclude that the issue is not waived or invited.

### 2. The Trial Court Didn't Err by Adding a Materiality Requirement to the Default Clauses in the Lease Agreement

¶ 40　　Caliper claims that the parties modified "the typical material breach standard through the language of the contract, requiring less than a material breach for a party to terminate the contract."  It says that the parties modified the standard by including default clauses in the contract, which permitted termination for less than a material breach.  Caliper therefore argues that the trial court improperly added a material breach standard to the lease agreement's default clauses.

¶ 41　　Under the common law, if there is a material breach of the contract by one party, it excuses the other party's performance under the contract.  *Kaiser v. Mkt. Square Disc. Liquors, Inc.*, 992

18

P.2d 636, 641 (Colo. App. 1999). A material breach "goes to the root of the matter or essence of the contract." *Interbank Invs., L.L.C. v. Vail Valley Consol. Water Dist.*, 12 P.3d 1224, 1229 (Colo. App. 2000) (quoting 6 Walter H. E. Jaeger, *Williston on Contracts* § 842, at 165 (3d ed. 1962)). "Whether there has been a material breach of contract turns upon the importance or seriousness of the breach and the likelihood that the injured party nonetheless received, or will receive, substantial performance under the contract." *Id.* at 1228.

¶ 42　A default clause is "[a] contract provision defining what constitutes an act of default and the consequences of it." Black's Law Dictionary 526 (12th ed. 2024). For example, Article 29 of the lease agreement states that the tenant, Caliper, will be in default if it fails to pay rent, sublets the premises without written consent from the landlord, or abandons the premises, among other default-worthy actions. Upon an "Event of Default" by the tenant, the landlord can re-enter the property and take possession, remove any property, or sue the tenant, among other remedies.

¶ 43　As Lotus points out, the word "'material' appears . . . six times in the trial court's Judgment. Three of those instances appear as

19

portions of direct quotes to non-overruled decisions of this [c]ourt and are not cited by Caliper." The fourth reference appears in a footnote, and the final two appear in the text.

¶ 44    As to the quotes of authority from this court, Caliper argues that the material breach standard "constitute[s] part of the trial court's comprehensive discussion of the typical material breach standard." We see no error in the court's summary of applicable law.

¶ 45    As to the next two references in the trial court's judgment, they each address both a breach and a default. In the first, located in one of the trial court's footnotes, the court stated that the water leaks "did not rise to the level of a material breach *or* default." A couple paragraphs later in the text, the court wrote that "the Final Leak and Lotus'[s] responses were not breaches (certainly not material breaches) of the Lease." We see no indication that the trial court interjected a material breach standard into the lease agreement as Caliper suggests. To the contrary, the plain language of the court's judgment indicates that it did not find Lotus's actions to be *either* a default under the lease agreement's terms *or* a common law material breach of the agreement.

¶ 46    In the sixth reference, the trial court said, "Caliper unilaterally and without good reason terminated the Lease on June 30, 2022. As noted above, it failed to provide notice and an opportunity to cure. These were material breaches of the lease." It's true that the trial court only referred to "material breach" here and not default. But based on our reading of the contract, the actions that the court found constituted a material breach would also certainly have constituted a default under the lease agreement. The court did not apply an improper standard in interpreting the contract by using the term "material breach," rather than "default," in this portion of its analysis.[5]

¶ 47    In the final analysis, it appears that the trial court addressed the claims both under the plain language of the agreement and under the common law breach of contract standards, likely at

---

[5] Caliper also argues that Articles 27 and 29 are default clauses that do not mention a material breach requirement, which is true. Article 29 lists the remedies available to Lotus if Caliper defaults. Article 27, however, doesn't list any remedies in the event Lotus defaults. Caliper claims that as the tenant, it "must have the same right [as Lotus] to terminate the Lease at any time after [Lotus] defaults," even though this remedy is not in the lease agreement. Because we affirm the trial court's conclusion that Lotus did not default, we need not resolve this issue.

Caliper's urging in its proposed findings of fact and conclusions of law. *See People v. Fueston*, 749 P.2d 952, 956 (Colo. 1988) (noting that a court "may appropriately look to the common law as an interpretive aid in determining the proper scope of [an agreement]"). We perceive no error in the court resolving the claims in this manner or in its resolution of those claims.

### D.    Attorney Fees

¶ 48    Caliper requests attorney fees and costs under C.A.R. 39.1. Lotus objects to Caliper's request and requests its fees and costs under Rule 39.1. It argues that Caliper not only materially breached the lease agreement by failing to pay rent, but that it also "failed to identify any statutory, contractual, or rule-based authority that would entitle it to an award of fees in this appeal."

¶ 49    A request for attorney fees on appeal "must include a specific request, under a separate heading, and must explain the legal and factual basis for an award of attorney fees. Mere citation to . . . a statute, without more, does not satisfy the legal basis requirement." C.A.R. 39.1.

¶ 50    Article 32.7 of the lease agreement provides for an award of attorney fees and costs under certain circumstances:

22

> In the event either party initiates legal proceedings or retains an attorney to enforce any right or obligation under this Lease or to obtain relief for the breach of any covenant hereof, the party ultimately prevailing in such proceedings or the non-defaulting party shall be entitled to recover all costs and reasonable attorneys' fees.

¶ 51 Lotus initiated legal proceedings to enforce the lease agreement because of Caliper's failure to pay rent. Lotus was the prevailing party in the trial court, and it likewise prevails on appeal. We therefore conclude that Lotus is entitled to its appellate attorney fees and costs under Article 32.7 of the lease agreement.

¶ 52 Thus, we grant Lotus's request for attorney fees and costs under Rule 39.1, and we remand this matter to the trial court to determine the amount of the appellate attorney fees award. Caliper's request for attorney fees and costs is denied.

### III. Disposition

¶ 53 The judgment is affirmed, and the matter is remanded to the trial court to determine the amount of appellate attorney fees and costs Lotus is entitled to.

JUDGE FREYRE and JUDGE BERNARD concur.

23